568

In the Interest of C.J.R., Appellee.

Appeal of Christine M.R.–B., Natural Mother, Appellant

Superior Court of Pennsylvania.

Submitted July 23, 2001.

Filed Aug. 15, 2001.

Jeffrey W. Stover, Bellefonte, for appellant.

Cindy J. Murphy, Bellefonte, for R.C.J., appellee.

John R. Miller, Bellafonte, for George Martin, appellee.

James P. Johnson, State College, for Centre County Children and Youth Services, appellee.

Before CAVANAUGH, JOHNSON, and HESTER, JJ.

HESTER, Judge:

¶ 1 Appellant, Christine M. R.-B., ("Mother"), appeals from the order of the Centre County Court of Common Pleas changing the goal of the family service plan of Centre County Children and Youth Services ("CYS"), Appellee, to adoption of her child, C.J.R. We affirm.

¶ 2 C.J.R. was born on September 23, 1998. CYS removed her from Mother's home six months later, on March 25, 1999, and placed her in the foster home of Diane and Harry W. ("Foster Parents"), where she continues to reside. The trial court summarized the reasons for placement as follows:

> At the time of her placement, C.J.R. was diagnosed as a Failure to Thrive infant with gross motor delays, who exhibited no attachment to any adult. Foster care placement was initiated due to C.J.R.'s inability to gain weight appropriately in Natural Mother's care, possible developmental delays, and reported parental neglect. Reunification services directed toward the reunification of C.J.R. with her Natural Mother were ended at the June 9, 2000 permanency review hearing due to Natural Mother's lack of progress.

Trial Court Opinion, 12/15/00, at 2.

¶ 3 Mother also has another daughter, Becky, who is C.J.R.'s half-sister. Becky, age seven, who was born on July 22, 1994, has lived most of her life in Indiana with the maternal grandparents, Della and George Martin ("Grandparents"), Mother's mother and stepfather. Becky is not involved in this appeal. On November 2, 2000, following a hearing, the trial court entered an order changing the placement goal for C.J.R. to adoption. Mother filed a motion for reconsideration, which the trial court granted, and it heard argument on December 8, 2000. On December 15, 2000, the trial court denied reconsideration, and this timely appeal by Mother followed.

¶ 4 Mother raises the following three issues for our review:

> A. Did the trial court abuse its discretion by the change of the placement goal to adoption?
>
> B. Did the trial court abuse its discretion by determining that the best interest of the child required custody to remain with the foster parents instead of Appellant's mother and stepfather, who also have custody of the child's half-sister?
>
> C. Was the trial court's ruling against the weight of the evidence?

Mother's brief at 4.

¶ 5 Our scope of review is settled:

> An order granting a goal change pursuant to the Juvenile Act, 42 Pa.C.S.A. §§ 6301–6365, is final and appealable. *In Interest of M.B.*, 388 Pa.Super. 381, 565 A.2d 804 (1989), *appeal denied*, 527 Pa. 601, 589 A.2d 692 (1990). Our standard of review in such cases is abuse of discretion. *In re L.J.*, 456 Pa.Super. 685, 691 A.2d 520 (1997). When reviewing such a decision we are bound by the facts as found by the trial court unless they are not supported in the record. *Id.* Furthermore, in a change of goal proceeding, the trial court must focus on the child and determine the goal in accordance with the child's best interests and not those of his or her parents. *In re J.S.W.*, 438 Pa.Super. 46, 651 A.2d 167 (1994); *In Interest of Z.W.*, 710 A.2d 1176 (Pa.Super.1998).

At each review hearing concerning a child who has been adjudicated dependent and removed from the parental home, the trial court must consider: the continuing necessity for and appropriateness of the placement; the extent of compliance with the service plan developed for the child; the extent of progress made towards alleviating the circumstances which necessitated the original placement; the appropriateness and feasibility of the current placement goal for the child; and, a likely date by which the goal for the child might be achieved. 42 Pa.C.S.A. § 6351(f); *In Interest of Z.W.*, 710 A.2d 1176 (Pa.Super.1998).

These statutory mandates clearly place the trial court's focus on the best interests of the child.

*In the Interest of A.P.*, 728 A.2d 375, 378 (Pa.Super.1999).

¶ 6 Mother purports to raise three issues in her statement of questions. However, she actually raises a single issue: whether the court abused its discretion in failing to transfer C.J.R.'s placement from foster parents to Grandparents. Mother levels no specific arguments challenging the trial court's conclusion that Mother failed to comply with the permanency plan and failed to make sufficient progress toward alleviating the conditions that necessitated the original placement. Similarly, Mother makes no argument concerning the court's conclusion that reunification will not be possible. She simply contends throughout her brief that C.J.R.'s placement should have been changed to Grandparents. It is clear that the record supports the trial court's assessment that adoption is in C.J.R.'s best interest and that placement with Foster Parents should continue.

■ ¶ 7 As part of their placement planning, CYS must identify permissible goals for a child in placement. 55 Pa.Code § 3130.67(b)(9) sets forth the permissible goals for a child in placement.

§ 3130.67–Placement Planning.

As part of their placement planning, CYS must identify permissible goals for a child in placement. 55 Pa.Code § 3130.67(b)(9) sets forth the permissible goals for a child in placement.

§ 3130.67–Placement Planning.

(a) Except for emergency placement, the county agency shall prepare an amendment to the service plan prior to placing a child.

(b) The amendment to the service plan shall include the following for each child placed . . . . :

. . . .

(9) An identification of one of the following goals for the child in placement:

(i) Return to own home.

(ii) Placement in the home of another relative.

(iii) Adoption.

(iv) Placement with a legal guardian.

(v) Independent living.

(vi) Long-term placement.

One goal is not mandated over another nor does the language of § 3130.67 require that each goal be implemented in the order in which they are listed. *Matter of Luis R.*, 430 Pa.Super. 518, 635 A.2d 170 (1993).

■ ¶ 8 In this case, CYS investigated the suitability of Grandparents as caretakers of C.J.R. since reunification or return to Mother was no longer feasible. Ms. Jenny Summers, family counselor for Centre County Youth Service Bureau, Youth and Family Services Reunification Program, testified that she arranged visits between Grandparents and C.J.R. every three weeks when Grandparents came to

Pennsylvania from their home in Indiana. N.T., 11/2/00, at 33–34. This visitation had been instituted by CYS, not by Grandparents. *Id.* at 34, 54. When Grandparents removed Becky from Mother's home due to their concerns about the girls' care, they left C.J.R. behind, anticipating Mother would object. *Id.* at 53. Despite this uneven interest in C.J.R., they nonetheless have complied with the CYS visitation arrangements. *Id.* at 35, 54.

¶ 9 Cynthia Miele, CYS case work supervisor, testified that CYS recommended maintaining C.J.R.'s placement with Foster Parents. She noted that Foster Parents had completely ameliorated C.J.R.'s condition that led to her removal from Mother, failure to thrive. Under Foster Parent's care, C.J.R. became emotionally and physically normal. Ms. Miele testified that if the child's living situation was disrupted, there was a potential for re-aggravation of developmental delays:

> [M]y concern is that at the time of [C.J.R.'s] placement she was diagnosed by medical professionals as a failure to thrive child. She had been hospitalized twice. She had gross motor delays. She had no attachment to any person. Since that time because she has lived in one place in a consistent environment that is stable and nurturing she has been able to form an attachment to [Foster Parents] whom I term her psychological parents.
>
> I believe that it would be too risky to disrupt this placement. [C.J.R.] did not begin her placement with a clean slate. She was damaged when she came into care. She was damaged because of the quality of care she received prior to placement. It's true that children have the ability to sustain moves, to endure under circumstances that are not best for them.... I'll just restate I believe it's too risky to move her from a home

where she is secure and where she is attached if I may use that term to a situation that may damage her.

> This is not a negative statement against her maternal grandparents.... I believe, however, that if we would make that move and it would be found to be a mistake then it's too late for [C.J.R.] and we may not be able to regain the wonderful gains she has made in her placement thus far.

*Id.* at 45–46.

¶ 10 During C.J.R.'s time in placement, CYS, through its reunification services, requested a psychological evaluation from Mid–Step Child Development Center that was finalized by report on September 6, 2000. The report was authored by Dr. Barry R. Brink, who also testified at the hearing. In his report, Dr. Brink incorporated the evaluation of Foster Parents by Dr. Kate R. Staley, who administered testing of C.J.R. CYS requested information and clinical impressions regarding the quality of C.J.R.'s attachment to Foster Family and the potential advantages and disadvantages of remaining in that household.

¶ 11 Dr. Staley observed interactions between C.J.R. and Foster Parents as a component of her evaluation. She detailed many behavioral indicators of parent-child attachment between C.J.R. and Foster Parents. She noted that C.J.R. frequently sought Foster Parents' attention in casual yet meaningful context. She appropriately stayed close to them and held onto them when entering the appointment room. It was Dr. Staley's conclusion that C.J.R. clearly identified with Foster Parents as significant people to her, demonstrating this by both her behavior and calling them "Poppa" and "Momma." Dr. Staley also concluded:

> I was impressed by both [C.J.R.] and her foster parents. They clearly have a

strong relationship with each other, built over a period of fifteen months of repeated daily interactions. [C.J.R.] is functioning as a typical developing child in all respects and does not appear, at this time, to demonstrate any developmental delays which might have been attributable to early deprivation/malnourishment during her first six months of life.

Psychological Evaluation, 6/15/00, at r.r. 085a.[1]

¶ 12 In addition, Dr. Staley met with various caseworkers who were involved with C.J.R. and Foster Parents. Dr. Staley noted that all representatives felt that Foster Parents were "wonderful" and very devoted to C.J.R. Their impressions revealed that C.J.R. is an intrinsic part of Foster Parents' family and attachment between them is very appropriate. Dr. Staley opined that C.J.R. would continue to receive the highest parental care and unconditional love if Foster Parents adopted C.J.R. *Id.*, R.R. at 086a.

¶ 13 The portion of the psychological evaluation that dealt with Grandparents was performed by Dr. Brink. Dr. Brink did not specifically evaluate Foster Parents; he relied upon the findings of Dr. Staley and encompassed them in his report. N.T., 11/2/00, at 5. Regarding Foster Parents, Dr. Brink concluded:

Harry and Diane [W.] have been the foster parents of [C.J.R.] since her placement on March 25, 1999. Behavioral observations by Dr. Staley revealed appropriate parent-child interactions and a solid bonding. Observations reports from supervisory personnel, and interview data confirm that the [foster parents] are very competent parents who have provided all of [C.J.R.'s] needs

during her placement. The examiner believes that the [foster parents] should be credited with remediating [C.J.R.'s] delays. If a decision is made to allow [foster parents] to permanently adopt [C.J.R.], the examiner is confident that [C.J.R.] will receive love, support and positive modeling throughout the remainder of her childhood.

*Id.*, R.R. at 097a.

¶ 14 Dr. Brink indicated in his report that Grandmother, age forty-two, had a history of heavy drinking and depression and is on long-term disability for arthritis and depression. *Id.;* R.R. at 092a. He noted that both Grandparents were raised in homes with a moderate to high degree of family dysfunction. Grandmother reported moderate physical abuse in her first marriage and sexual abuse directed to Mother and her sister by Grandmother's first husband. On the other hand, Dr. Brink opined that Grandparents' relationship appeared stable. Dr. Brink concluded:

In summary, the examiner believes that [Grandparents] care deeply about [C.J.R.] and are serious about their intentions to adopt her and provide an appropriate family environment. While the [Grandparents] have lived more dysfunctional lives individually, they appear to have matured within their relationship and corrected many of the behavioral and emotional difficulties which each experienced earlier. Overall, interview material, observations, and test results suggest that the [Grandparents] can provide an appropriate loving home for [C.J.R.] if a decision is made to place her in their care.

. . . .

---

1. This report was admitted at the 11/2/00 hearing. Since the pages of the report are not numbered, we will refer to its placement in the Reproduced Record for ease of reference.

There is no question that [C.J.R.'s] separation from the [foster] family would result in a significant emotional adjustment to her change in living situation. Any child who is removed from a caring residence at age two where they have lived for most of their life will undergo an acute emotional adjustment. The severity of this adjustment and the potential for more lasting emotional difficulties depends upon the manner of relocation and the caring received from [C.J.R.'s] new guardians. Given that [C.J.R.] has recovered from her developmental delays and is functioning at emotional and developmental levels appropriate for her age, the examiner believes that she is capable of managing the acute stressors of this separation if the Court determines that she should be placed with [Grandparents] in Indiana. If this change in custody and residence, is ordered, final planning should be discussed by [Grandparents, Foster Parents,] and CYS.

. . . .

The examiner believes that there is *no clear cut answer* to the decision of whether to leave [C.J.R.] in the Custody of [Foster Parents] or place her in Indiana with her grandparents. Instead, there are relative strengths and disadvantages to both possible outcomes. If a decision is made to place [C.J.R.] with her grandparents, the relative strengths of this decision would be a placement with family members who care deeply about her well-being. In addition, [C.J.R.] would grow up with a sibling fairly close to her own age and a sibling bond which is not available in [Foster Parents'] household. Finally, placement with [Grandparents] in Indiana would guarantee [C.J.R.'s] development of family background, relation-ships, and continuation of relationship with her mother. The relative disadvantages of the placement with the [Grandparents] would be the need of [C.J.R.] to experience the psychological trauma and adjustment of losing her family of origin for the past fifteen months. At this point in her life, [C.J.R.'s] existence and emotional functioning has centered around her home and family life with [Foster Parents]. This would be a major loss.

*Id.,* R.R. at 098–99a (emphasis added).

■ ¶ 15 In support of her position that custody should be transferred to Grandparents, Mother relies upon the policy in this Commonwealth that absent compelling reasons to the contrary, siblings, including half siblings, should be raised together whenever possible. *In re Davis,* 502 Pa. 110, 465 A.2d 614 (1983); *Ferdinand v. Ferdinand,* 763 A.2d 820 (Pa.Super.2000). However: "[T]his factor cannot be automatically elevated above all others, but must be weighed in conjunction with the others." *In re Davis, supra,* 502 Pa. at 124, 465 A.2d at 621. Acknowledging this policy, the trial court in this case nonetheless determined that "the benefits and bonds from a sibling relationship do not justify removing C.J.R. from [Foster Parents] when C.J.R.'s existence and emotional functioning is centered on her life with [Foster Parents]." Trial Court Opinion, 12/15/00 at 3 (footnote omitted). The trial court concluded that there were compelling reasons why C.J.R. should not be transferred to Grandparents. The evidence of record supports this conclusion.

¶ 16 C.J.R.'s counsel has made a cogent, persuasive argument in response to Mother's claim. We agree with the child's advocate that many other factors weighed against placement with Grandparents and support the trial court's decision. First,

Grandparents did not take C.J.R. with them when they removed their other grandchild, thereby indicating that they did not intend to raise the girls as a family unit. Second, C.J.R. will face serious adjustment difficulties. Third, C.J.R. already has experienced many difficulties in her short life. Finally, C.J.R. now enjoys a loving, stable environment with her parents and family.

¶ 17 We cannot conclude that the trial judge, the Honorable David E. Grine, abused his discretion in reaching his conclusion. Mother has not complied with the permanency plan and has not made progress toward alleviating circumstances that led to placement. The court did not abuse its discretion in freeing this child for adoption by the only "parents" she has known.

¶ 18 Order affirmed.