J-S23014-19

NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P. 65.37

| | |
|---|---|
| IN THE INTEREST OF:  D.P., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF:  J.P. NATURAL FATHER | No. 1588 WDA 2018 |

Appeal from the Order Entered October 22, 2018
In the Court of Common Pleas of Erie County Juvenile Division
at No(s): CP-25-DP-0000170-2017

| | |
|---|---|
| IN THE INTEREST OF:  R.P., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF:  J.P. NATURAL FATHER | No. 1589 WDA 2018 |

Appeal from the Order Entered October 22, 018
In the Court of Common Pleas of Erie County Juvenile Division
at No(s): CP-25-DP-0000171-2017

| | |
|---|---|
| IN THE INTEREST OF:  J.P., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF:  J.P. NATURAL FATHER | No. 1590 WDA 2018 |

Appeal from the Order Entered October 22, 2018
In the Court of Common Pleas of Erie County Juvenile Division
At No(s): CP-25-DP-0000172-2017

| | |
|---|---|
| IN THE INTEREST OF:  E.P., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF:  J.P. NATURAL FATHER | No. 1591 WDA 2018 |

Appeal from the Order Entered October 22, 2018
In the Court of Common Pleas of Erie County Juvenile Division
At No(s): CP-25-DP-0000173-2017

J-S23014-19

BEFORE: BENDER, P.J.E., NICHOLS, J., and COLINS, J.*

MEMORANDUM BY BENDER, P.J.E.: FILED MAY 31, 2019

J.P. (Father) appeals from the orders, dated October 19, 2018, and entered on the docket in the Court of Common Pleas of Erie County on October 22, 2018, which changed the permanency goal for his four sons to adoption.[1] Following extensive review, we affirm.

On appeal, Father's brief lists the following questions for our review:

1. WHETHER THE TRIAL COURT ABUSED ITS DISCRETION AND/OR COMMITTED AN ERROR OF LAW BY FINDING MINIMAL COMPLIANCE WITH THE COURT[-]ORDERED TREATMENT PLAN IN ITS ORDER OF OCTOBER 10, 2018, WHEN THE REASONS FOR THE ADJUCIATION [sic] OF DEPENDENCY[,] ABUSE, UNSTABLE HOUSING, HOME INFESTATION OF MICE AND BED BUGS, DOMESTIC VIOLENCE, LEAVING [MOTHER] IN A CARETAKING ROLE, FAILURE TO PROTECT CHILDREN FROM ABUSE, FAILURE TO SEEK SERVICES FOR HIS MENTAL HEALTH, AND LACK OF FOLLOW THROUGH WITH SERVICES HAD BEEN ALLEVIATED[?]

2. WHETHER THE TRIAL COURT ABUSED ITS DISCRETION AND/OR COMMITTED AN ERROR OF LAW/FACT WHEN IT DENIED THE [SUBPOENAS] ISSUED BY THE FATHER TO HAVE THE MINOR OLDER CHILDREN, D.P. AND R.P., AGED 12 AND 9, APPEAR AND TESTIFY IN CAMERA AT THE CHANGE OF GOAL HEARING[?]

3. WHETHER THE TRIAL COURT ABUSED ITS DISCRETION AND/OR COMMITTED AN ERROR OF LAW BY FAILING TO APPOINT AN ATTORNEY FOR THE MINOR CHILDREN, D.P. AND R.P[.,] IN THE CHANGE OF GOAL HEARING[?]

4. WHETHER THE TRIAL COURT ABUSED ITS DISCRETION AND/OR COMMITTED AN ERROR OF LAW BY DENYING []

---

* Retired Senior Judge assigned to the Superior Court.

[1] B.D. (Mother) also filed appeals from the orders that granted the goal change for each of her sons. Mother's appeals are docketed at Nos. 1604 WDA 2018, 1605 WDA 2018, 1606 WDA 2018 and 1607 WDA 2018.

FATHER'S MOTION FOR SPECIAL RELIEF REQUESTING THAT THE COURT RE-OPEN THE RECORD TO APPOINT COUNSEL FOR THE CHILDREN AND HAVE THE COUNSEL ADVISE THE COURT OF THE CHILDREN'S WISHES REGARDING THE CHANGE OF GOAL[?]

5. WHETHER THE TRIAL COURT ABUSED ITS DISCRETION AND/OR COMMITTED AN ERROR OF LAW BY FAILING TO GIVE APPROPRIATE WEIGHT TO THE UNCONTROVERTED TESTIMONY THAT THERE WAS A BOND BETWEEN SOME OF THE CHILDREN AND [] FATHER[?]

6. WHETHER THE TRIAL COURT ABUSED ITS DISCRETION AND/OR COMMITED AN ERROR OF LAW BY FAILING TO ACKNOWLEDGE THAT THE CHILDREN HAD BEEN IN PLACEMENT FOR LESS THAN ONE YEAR BEFORE A CHANGE OF GOAL PETITION WAS FILED, WHEREBY NOT GIVING FATHER SUFFICIENT TIME TO RECITFY [sic] THE CONDITIONS FOR REMOVAL OF CHILDREN[?]

7. WHETHER THE TRIAL COURT ABUSED ITS DISCRETION AND/OR COMMITTED AN ERROR OF LAW WHEN IT FAILED TO RECOGNIZE THAT AT THE MAY 23, 2018 REVIEW HEARING, REUNIFICATION WITH FATHER WAS THE GOAL BY END OF SUMMER, 2018, AND FIVE (5) WEEKS LATER FILED A MOTION FOR CHANGE OF GOAL TO ADOPTION; A DECISION THAT WAS NOT SUPPORTED BY THE EVIDENCE[?]

8. WHETHER THE TRIAL COURT ABUSED ITS DISCRETION AND/OR COMMITTED AN ERROR OF LAW BY CHANGING THE GOAL TO ADOPTION AFTER ONE INDISCRETION BY FATHER ALLOWING CONTACT WITH ONE CHILD WITH MOTHER DURING AN UNSUPERVISED VISIT ON JUNE 25, 2018, WHEN ALL OTHER REMEDIAL MEASURES HAD BEEN ACCOMPLISHED[?]

Father's brief at 5.

We review issues relating to the changing of the placement goal for children to adoption pursuant to the following:

> [T]he standard of review in dependency cases requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record, but does not require the appellate court to accept

the lower court's inferences or conclusions of law. Accordingly, we review for an abuse of discretion.

In re R.J.T., 608 Pa. 9, 9 A.3d 1179, 1190 (Pa. 2010).

Pursuant to [42 Pa.C.S.A.] § 6351(f) of the Juvenile Act, when considering a petition for a goal change for a dependent child, the juvenile court is to consider, inter alia: (1) the continuing necessity for and appropriateness of the placement; (2) the extent of compliance with the family service plan; (3) the extent of progress made towards alleviating the circumstances which necessitated the original placement; (4) the appropriateness and feasibility of the current placement goal for the children; (5) a likely date by which the goal for the child might be achieved; (6) the child's safety; and (7) whether the child has been in placement for at least fifteen of the last twenty-two months. The best interests of the child, and not the interests of the parent, must guide the trial court. As this Court has held, a child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting.

In re A.B., 19 A.3d 1084, 1088-89 (Pa. Super. 2011) (citations and quotation marks omitted).

In re J.D.H., 171 A.3d 903, 908 (Pa. Super. 2017).

We have reviewed the certified record, the briefs of the parties, the applicable law, and the comprehensive opinion authored by the Honorable Shad Connelly, senior judge of the Court of Common Pleas of Erie County, filed on January 14, 2019. We conclude that Judge Connelly's extensive and well-reasoned opinion disposes of the issues raised by Father. In particular, we note that Father is primarily seeking to have this Court reweigh the evidence in a light more favorable to him. However, it is beyond our purview to disturb the credibility determinations of the trial court when the testimony

relied upon by the trial court is supported by the record. The trial court was free to conclude that Father was unlikely to remedy his problems in the near future; thus, the permanency needs of Children dictate changing their goal to adoption. Accordingly, we adopt Judge Connelly's opinion as our own and affirm the orders appealed from on that basis.

Orders affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/31/2019

IN THE INTEREST OF
D.P., R.P., J.P., and E.P.,    :    IN THE COURT OF COMMON PLEAS
          Minors    :    OF ERIE COUNTY, PENNSYLVANIA
Adjudicated Dependent    :    JUVENILE DIVISION

APPEAL OF J.P.,    :    NO. 170, 171, 172, 173 OF 2017
Natural Father

JUDGES COPY

### 1925(a) OPINION

On October 22, 2018 an order was entered in a dependency action changing the goal to adoption for D.P., R.P., J.P., and E.P., minor children of J.P. (Appellant/Father). The father now challenges that order. The father is contending this court erred in several respects when it eliminated reunification as a goal. The record supports that the finding of change of goal to adoption was established by clear and convincing evidence and is in the best interests of the child. It is therefore requested the Superior Court affirm the order.

### PROCEDURAL HISTORY AND FACTS

D.P., born June 6, 2006; R.P. born January 7, 2009; J.P., born May 4, 2012; and E.P., born October 9, 2015, are all children of B.D., natural mother, and J. P., natural father. The family had been living in North Carolina, but moved to Erie. In May, 2017, OCY received allegations that the mother had physically assaulted some of the children. The father filed a PFA Petition on behalf of the children against the mother that was eventually withdrawn. Services were opened with OCY in May, 2017, but ultimately, all four children were removed from the parents' care and placed in foster care. An Adjudication/Dispositional Hearing was held on August 14, 2017 before this court. OCY had filed Dependency Petitions for the children. The parents stipulated that their children were without proper parental care or control based upon the following allegations:

1. The (parents have) a history with the Agency due to concerns of abuse, unstable housing, domestic violence, and lack of follow through with services. Furthermore, the family was involved with ongoing services since May, 2017 and (they) failed to alleviate the issues;

2. The (parents) have an extensive history in North Carolina due to concerns of physical abuse, neglect, deplorable home conditions, and drug and alcohol abuse. The cases in North Carolina were ultimately unfounded and closed by CYS.

3. The (parents) have failed and/or are unwilling to provide a safe and stable living environment. Furthermore, the home had an infestation of mice and bed bugs in May, 2017 and the conditions have since worsened resulting in the family being evicted.

4. The (parents) have failed and /or are unwilling to seek treatment for (their) mental health

The mother additionally admitted:

5. (The mother) has previously had two children removed from her care over 20 years ago and successfully placed for adoption;

6. (The mother) has physically abused the minor (children). Furthermore, the (children) reported that (they are) fearful of (the mother) due to her hitting, scratching, pulling (their) hair, and throwing objects at (them);

7. (The mother) has a criminal history including Aggravated Assault and Criminal Conspiracy.

The father additionally admitted:

5. (The father) has failed to prevent physical abuse to the minor (children). Furthermore (the father) disclosed witnessing the abuse and neglect of his (children) on multiple occasions; however he has failed to protect the (children);

6. (The father) has failed to provide a safe and stable home for the minor (children). Furthermore, he continues to leave (the mother) in a caregiver role despite witnessing abusive behaviors.

Services had been extended to the family prior to the necessity of the children's removal and adjudication of dependency. Calls were received by OCY in May, 2017 alleging physical abuse to the children. Investigations determined the abuse was unfounded, but services were opened. Subsequently, J.P. filed a Protection From Abuse Act Petition on behalf of the children against the mother, B.D. Prior to any action on the petition, the children were removed and the dependency actions begun. The court issued a Dependency/Dispositional Order on August 17,

2

2017, finding all 4 children dependent based upon the stipulated allegations of fact, and ordering the parents to be involved with a number of services. The goal was reunification of the family.

One of the main agencies involved with the family was Family Based Mental Health. Jessica Edmunds was the therapist assigned to the family. Edmunds began working with the family in June, 2017, and described the program as providing services in therapy, case management and crisis. *(10/10/2018 N.T. p.5)*. The goals or problem areas being addressed with the family were community- maintaining contact with all family service providers; family-boundaries and expectations and consequence with the parents, including anger management and parenting techniques; and individual - needs such as coping and communication skills. *(10/10/2018 N.T. p. 5-6)*.

Initially, J.P. and B.D., the parents, were together in sessions. However, their relationship during the sessions was deemed "too toxic" by Ms. Edmunds, meaning constant arguments, disagreements, an overall unhealthy atmosphere. Eventually, the joint sessions were terminated, and the parents were seen individually once they had split up. *Id.* J.P. wanted one of his goals to be distancing himself from B.D. The father indicated on more than one occasion that he needed to distance himself from the mother. *(10/10/2018 N.T. pp. 35-36, 37-38)*. Despite the positive effort J.P. appeared to be giving with Ms. Edmunds' and the program, she found that he would normally take two steps forward, and then two back, Something would cause him to become upset and be more negative. *(10/10/2018 N.T. p. 9)*. Although J.P. had stipulated to the finding of dependency of his children, he would tell Ms. Edmunds that the children shouldn't have been removed. *(10/10/2018 N.T. p. 37)*.

B.D. would participate in sessions and read the materials she was given. However, the mother disagreed with all the parenting techniques with which she was instructed. B.D. never

agreed with any of the materials she was given for the purpose of helping to raise her children. *(10/10/2018 N.T. pp. 33, 36).* B.D. was terminated from the Family Based Mental Health program in July, 2018 because she was deemed not therapeutically appropriate as she refused to utilize the materials she was provided, and was surreptitiously recording therapy sessions. *(10/10/2018 N.T. pp. 6-7, 17).*

The precipitating event which led to the termination of B.D. from the Family Based service occurred on June 19, 2018. The mother was having a supervised visit with the oldest child, D.P. Ms. Edmunds was supervising the visit and was observing it behind a one-way mirror at OCY. The child was not in a good mood, and the mother constantly pressed him as to what was wrong. D.P indicated that the mother wasn't working to get the children back, and mentioned abuse. This caused a very vocal and explosive disagreement. B.D. called her child a "liar", and rejected his feelings about the situation. *(10/10/2018 N.T. pp. 6-9).* D.P. started talking about past abuse and told his mother that if she ever hit him again, he would hit her back. Mom's response was that if he raised a hand to her, she would "beat his ass", and told him he was the reason she had lost her family. *(9/9/2018 N.T. p. 39).* Ms. Edmunds had to intervene and had the child removed. One of the areas that Ms. Edmunds had been working with B.D. on was appropriate ways to talk to children. It was another of the parenting techniques B.D. rejected, and resulted in the June 19th blow-up. After this visit, and the revelation about recording therapy sessions, B.D. was discontinued from Family Based Mental Health. (10/10/2018 *N.T. pp. 9, 33).*

Shannon Spiegel of OCY was the family's caseworker beginning in December 2017. Throughout the Agency's involvement with B.D., the mother did not acknowledge any issue about her ability to care for the children or the reasons the children were in OCY's care.

*(9/9/2018 N.T. pp. 39-40).* This attitude was in spite of B.D.'s admissions in August, 2017 of her abuse and inability to properly parent her children.

Although the plan through June, 2018 was to reunify the children with the father, who had split from B.D., he admitted to a "co-dependent relationship with her, and that he could not get away from the mother; that she was a "drug" to him. *(9/9/2018 N.T. p. 40, 69).* Services were offered to J.P. to deal with this co-dependency issue, services he stated he wanted. *(10/10/2018 pp. 35-36).* OCY was going to increase unsupervised visits with the father one child at a time so as not to overwhelm him. The first weekend visit on the June 8, 2018 with D.P. went well. *(9/9/2018 N.T. p. 34).* There were a number of discussions with the father that there was to be no unauthorized contact with the mother. *(9/9/2018 N.T. pp. 34-35, 37-38, 70 -71).* Another weekend visit took place the following weekend, which happened to include Father's Day. At first, it appeared that visit had no issues. However an allegation was received on June 25[th] that the father had taken the child to the mother's house without permission, and that there was a plan to reunite with the children, later with mom, and then move out of state. *36). (9/9/2018 N.T. pp. 35-36).* J.P. was confronted with this allegation. Initially, the father said B.D. showed up at a friend's picnic unexpectedly where the dad and child were, and that he later left. Ms. Spiegel talked to D.P. later about how the visits were going. Ms. Spiegel learned that J.P. had taken D.P. over to the mother's residence, where the child spent the night. D.P. told Spiegel that he didn't want to go to his mother's on Father's Day, but he didn't want to disappoint his dad. D.P. had never been to the mother's residence, but was able to describe the layout, and said mom knew they were coming because they didn't have to break into the house. *(9/9/2018 N.T. pp. 35-37).* The father was confronted after Ms. Spiegel talked to D.P., and he admitted he allowed the child to have unsupervised, unauthorized contact with B.D. and let the child spend the night. *Id.*

Unfortunately, after this visit, D.P.'s behaviors escalated in the foster home, and he ultimately had to be removed. *Id.* D.P. also had to be hospitalized for mental health reasons a little later in the summer. Jessica Edmunds stated there was a correlation between the visits with mom in June and the escalation in D.P.'s behaviors. *(9/9/2018 N.T. pp 26-27).*

Shannon Spiegel concluded that despite the efforts of O.C.Y., Family Based Mental Health and other services, the ties between the mother and father were not being eliminated. J.P. had not alleviated any of his co-dependency with the mother, and failed to show an ability to care for himself on his own , or care for his children. Despite the lengthy history of involvement with child protective agencies in multiple jurisdictions, the dad did not acknowledge or realize why his children were in care. J.P.'s relationship with OCY was turbulent at times. He would thank the Agency for intervening and helping him, then accuse it of kidnapping children and selling them. J.P. did not consistently accept responsibility as to the reasons his children were adjudicated dependent. *(9/9/2018 N.T. pp 44, 64, 71-72).* B.D. had been terminated from services by Family Based Mental Health after it was determined the mother was not involved with it on a therapeutic level, and she was recording sessions without permission. *(9/9/2018 N.T. p. 65-66.).*

Ms. Spiegel felt that continuing contact with the parents resulted in continuing trauma for the children. *(9/9/2018 N.T. pp. 65-66).* The two youngest children, J.P. and E.P., were in a potential adoptive home. D.P. wanted to be adopted, but have some form of contact with his father. R.P., 9 years old, had made statements he did not want to be adopted. *(9/9/2018 N.T. pp. 41-43).* Both D.P. and R.P. have indicated that they have concerns about their father's ability to protect them from their mother. *(9/9/2018 N.T. p 61).* Spiegel had no confidence that J.P. could stay away from B.D. and believed the best interests of the children necessitated a change of goal from reunification to adoption. *(9/9/2018 N.T. p 43, 44-45).*

Julie Lafferty, a supervisor at OCY, was involved in the case from its inception in July, 2017, and was Shannon Siegel's supervisor. *(9/9/2018 N.T. pp70-71, 75)*. Ms. Lafferty corroborated Spiegel's description of the father's attitude towards OCY. From J.P.'s allegations of kidnapping; taking children for cash; and illegally removing them and stealing them every day, to his contacting a state representative's office claiming his children were kidnapped, and his wife wasn't being given a chance to work for reunification, Lafferty concluded the circumstances of the children's placement had not been alleviated by the parents. *(9/9/2018 N.T. pp. 71-74)*. Ms. Lafferty did not believe J.P. could protect the children from B.D., or that he would choose them over mom, because he and the mother had no desire to be apart, or give each other up. Neither parent has any idea how their behaviors affect their children, and the children do not believe dad will protect them, and that he will get back together with the mother. *(9/9/2018 N.T. pp75-80)*.

J.P. admitted taking D.P. to see the mother; that he has discussed moving to North Carolina with the children; and that he still feels the children were prematurely removed. *(10/10/2018 N.T. pp. 45, 52, 56)*. The father agreed that he stated his relationship with B.D. was like an addict relapsing, and that he is co-dependent with her. *(10/10/2018 N.T. pp 65-66)*. J.P acknowledged the children suffered from past abuse and trauma and that there was not a healthy relationship between the mother and children. *(10/10/2018 N.T. pp 76-78)*.

The father denied making belligerent statements to Shannon Spiegel or Agency staff. He also denied posting items on Facebook about his animosity towards government officials or CPS workers. *(10/10/2018 N.T. pp. 82-83)*. J.P. admitted he goes by the name J.D. on his Facebook account. *(10/10/2018 N.T. p. 85)*. During the lunch recess, J.P. deleted his Facebook account. *(10/10/2018 N.T. p. 92)*. Before the account was deleted, copies of posts from September 7, 14

7

and 23, 2018 were made and marked as exhibits. The posts from September 7, 2018 were Exhibits 1 and 2; September 14, 2018 was Exhibit 3; and September 23, 2018 marked Exhibit 4. (10/10/2018 N.T. pp.92-94). Exhibit 1 reads "WOW..what a weird hearing..Courtroom was shut down for an hour." Exhibit 2 reads "Wife shut whole dam court hearing down for over an hour...over her phone...lol". Exhibit 3: " Ah hell.. Let's just get this war started..hit all SW(Social Workers) at their home like they did us. Post their homes and neighborhood.". Exhibit 4: "Halloween..time to put on a mask and HIT EM HARD...fuk CPS social workers.". J.P. admitted he posted the exhibits, but as to Exhibits 3 & 4, only that he shared the posts. Exhibits 1 and 2 were admitted; 3 and 4 were admitted over objection, but it was noted that objection went to the weight of evidence, and the father's claim he only shared those two posts would be considered by the court.(*10/10/2018 N.T. pp. 92-95*).

Counsel for J.P. issued subpoenas to have the minor children D.P. and R.P. attend the Permanency Review Hearing on September 9, 2018. OCY filed a Motion to Quash the Subpoenas. After a hearing prior to the start of the Review Hearing, the Motion to Quash was Granted. (*9/9/2018 N.T. pp. 3-32*). Counsel for the father filed a Motion for Special Relief on October 19, 2018. The relief requested was for the reopening of the change of goal hearing, and appointment of separate legal counsel for the three oldest children to represent their legal interests at that hearing. The relief requested was Denied on October 26, 2018.

The Agency filed a Motion to Change Permanency Goal on July 5, 2018, indicating its desire to change the goal of D.P., R.P., J.P. and E.P.'s permanent placement from Reunification concurrent with Adoption to Adoption. This Court, after reviewing the testimony and evidence presented at the Permanency Review Hearings on September 9 and Octber10, 2018 found that the Agency met their burden by clear and convincing evidence and that the permanency goal

should be changed to Adoption. Services were terminated. An order was entered, on October 19, 2018, directing the Agency to file an Involuntary Termination of Parental Rights Petition.

## ISSUES PRESENTED

Appellant raises the following issues:

1. THE TRIAL COURT ABUSED ITS DISCRETION AND/OR COMMITTED AN ERROR OF LAW BY FINDING MINIMAL COMPLIANCE WITH THE COURT ORDERED TREATMENT PLAN IN ITS ORDER OF OCTOBER 10, 2018, WHEN THE REASONS FOR THE ADJUDICATION OF DEPENDENCY: ABUSE, UNSTABLE HOUSING, HOME INFESTATION OF MICE AND BED BUGS, DOMESTIC VIOLENCE, LEAVING ████████ IN A CARETAKING ROLE, FAILURE TO PROTECT THE CHILDREN FROM ABUSE, FAILURE TO SEEK SERVICES FOR HIS MENTAL HEALTH, AND LACK OF FOLLOW THROUGH WITH SERVICES HAD BEEM ALLEVIATED.

2. THE TRIAL COURT ABUSED ITS DISCRETION AND/OR COMMITTED AN ERROR OF LAW/FACT WHEN IT QUASHED THE SUBPOENAS ISSUED BY THE FATHER TO HAVE THE MINOR OLDER CHILDREN, D.P. AND R.P., AGED 12 AND 9, APPEAR AND TESTIFY IN CAMERA AT THE CHANGE OF GOAL HEARING.

3. THE TRIAL COURT ABUSED ITS DISCRETION AND/OR COMMITTED AN ERROR OF LAW BY FAILING TO APPOINT AN ATTORNEY FOR THE MINOR CHILREN, D.P. AND R.P. IN THE CHANGE OF GOAL HEARING.

4. THE TRIAL COURT ABUSED ITS DISCRETION AND/OR COMMITTED AN ERROE OF LAW BY DENYING THE FATHER'S MOTION FOR SPECIAL RELIEF REQUESTING THAT THE COURT RE-OPEN THE RECORD TO APPOINT COUNSEL FOR THE CHILDREN AND HAVE COUNSEL ADVISE THE COURT OF THE CHILDREN'S WISHES REGARDING THE CHANGE OF GOAL.

5. THE TRIAL COURT ABUSED ITS DISCRETION AND/OR COMMITTED AN ERROR OF LAW BY FAILING TO GIVE UNCONTROVERTED TESTIMONY THAT THERE WAS A BOND BETWEEN SOME OF THE CHILDREN AND THE FATHER.

6. THE TRIAL COURT ABUSED ITS DISCRETION AND / OR COMMITTED AN ERROR OF LAW BY FAILING TO ACKNOWLEDGE THAT THE CHILDREN HAD BEEN IN PLACEMENT FOR LESS THAN ONE YEAR BEFORE THE

CHANGE OF GOAL PETITION WAS FILED, WHEREBY NOT GIVING FATHER SUFFICIENT TIME TO RECTIFY THE CONDITIONS FOR REMOVAL OF CHILDREN..

7. THE TRIAL COURT ABUSED ITS DISCRETION AND / OR COMMITTED AN ERROR OF LAW WHEN IT FAILED TO RECOGNIZE THAT AT THE MAY 23, 2018 REVIEW HEARING, REUNIFICATION WITH FATHER WAS THE GOAL BY END OF SUMMER, 2018, AND FIVE (5) WEEKS LATER FILED A MOTION FOR CHANGE OF GOAL TO ADOPTION; A DECISION THAT WAS NOT SUPPORTED BY THE EVIDENCE.

8. THE TRIAL COURT ABUSED ITS DISCRETION AND / OR COMMITTED AN ERROR OF LAW BY CHANGING THE GOAL TO ADOPTION AFTER ONE INDISCRETION BY FATHER ALLOWING CONTACT WITH ONE CHILD WITH MOTHER DURING AN UNSUPERVISED VISIT ON JUNE 25, 2018 WHEN ALL OTHER REMEDIAL MEASURES HAD BEEN ACCOMPLISHED.

9. THE TRIAL COURT ABUSED ITS DISCRETION AND / OR COMMITTED AN ERROR OF LAW BY FAILING TO CONSIDER THE BEST INTERSTS OF THE CHILDREN AND WHETHER THEIR BEST INTERSTS WOULD BE SERVED BY SEVERING THE PARENT / CHID RELATIONSHIP.

## STANDARD OF REVIEW

When reviewing an appeal from a decree changing a permanency goal, an appellate court accepts the findings of fact and the credibility determinations of the juvenile court if they are supported by the record. *In re R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010). An abuse of discretion standard is used by the appellate court.

An abuse of discretion is not found if the lower judgement was reasonable, the court applied the law, and the court's action was not a result of partiality, prejudice, bias, or ill will.

Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the lower

10

court's decision, the decree must stand. *In re A.K.*, 936 A.2d 528, 533 (Pa. Super. 2007). In a change of goal proceeding, the lower court must focus on the child's best interests, not the interests of the parents. *Id.*

The Agency has the burden of proving the change in goal would be in the child's best interests. *In re M.B.*, 674 A.2d 702, 704 (Pa. Super. 1996).

## DISCUSSION

Out of the father's nine issues raised in this appeal, Issues 1, 5, 6, 7, and 8 are all alleging, in one form or another, that this court erred or abused its discretion in granting the change of goal from reunification to adoption. Those issues claim the reasons for adjudication of the children had been alleviated (1); that there was a bond between some of the children and the father (5); the father did not have sufficient time to rectify the conditions that led to the removal of the children (6); that changing the goal to adoption 5 weeks after reunification with the father was ordered as the treatment goal was unsupportable (7); and one indiscretion of the father allowing contact with the mother did not justify the change in goal to adoption (8).

The history of this family throughout the years demonstrated the inability of the father to protect and parent his children. While living in North Carolina, child protective services got involved with the family due to allegations of abuse. Although those allegations were eventually deemed unfounded, services were opened. Little or no information is available regarding the cooperation of the family with North Carolina authorities. One need only look at what transpired once the family moves to Erie to conclude intervention was not particularly successful in North Carolina. J.P. files a Protection From Abuse Act Petition on behalf of his children alleging abuse by the mother, B.D. OCY gets involved and initiates services such as Family Based Mental Health with the family. The abuse allegations were ultimately unfounded, but despite a number

of agencies' involvement, conditions in the home deteriorate to the extent that the children have to be removed. Both parents agree to the alleged facts that the children were living in unhealthy and unsafe conditions; the mother had abused them; the father did not protect the children while witnessing abuse at the hands of the mother; the parents were unwilling to seek mental health treatment; the parents did not provide a safe environment for the children, and these issues extended back to the family's time in North Carolina.

The parents had joint counselling with Jessica Edmunds. She found the sessions "toxic" with the constant fighting and disagreements between the parents. Once the parents split, each saw her individually. J.P. would make progress, but as Edmunds testified, he would take two steps forward, then two back. Something would trigger his anger with OCY, and the father would retreat to negativity. The mother rejected all suggestions regarding parenting techniques and how to relate to her children. Her rejection of proper parenting culminated in the "explosive" visit with her oldest child, D.P. on June 19, 2018, where she called him a "liar" and blamed him for the separation of the family. J.P., despite his apparent willingness to properly parent his children, consciously allowed D.P. to have an unauthorized overnight visit with B.D. The mother had shown no inclination to change her behaviors to provide safe and proper parenting for her children. The father had received services, training and therapy since June, 2017; had filed a PFA against the mother for abuse of her children: admitted witnessing the abuse; and admitted that the relationship between the children and their mother was troublesome. With all this acknowledged information about the mother, J.P. still permitted unsupervised, unauthorized visitation.

"Actions speak louder than words" is a better barometer of the father's alleviation of the circumstances which led to the children's removal and adjudication of dependency. J.P., while

saying he appreciated OCY for providing services to help him to reunite with his family, would turn around and complain OCY kidnaps children, sells children, and did not give his wife a chance to rehabilitate herself. J.P. admittedly posted a number of items on Facebook during the period while the court was considering the change of goal. The first two posts from September 7, 2018 take delight in the fact that his wife disrupted the court hearing for over an hour. The September 14, 2018 post, and the September 23, 2018 post although only "shared" with Facebook friends, reveal the acceptance of sinister attitudes and actions which threaten the safety of those charged with protecting the most vulnerable in our society. A final deed by J.P. sheds probably the most light on his attitude towards authority. During the lunch recess at the October 10, 2018 Review Hearing, after the Facebook posts had come to light, J.P. deleted his Facebook account, which he had under the name of J.D. The deviousness underscores J.P.'s attempt to convince the court he was something he really wasn't – a parent ready to parent and protect his children. The admitted addictive relationship between himself and B.D. is the truth of this matter. He cannot break away from his wife, and will choose her over his children, even if this compromises their safety.

> Abuse of discretion by this court has been alleged.

> Where the allegation is abuse of discretion, the trial court not the appellate court, is charged with the responsibilities of evaluating credibility of the witness and resolving any conflicts in the testimony. In carrying out these responsibilities, the trial court is free to believe all, part, or none of the evidence. When the trial court's findings are supported by competent evidence of record, we will affirm, "even if the record could also support the opposite results."

*In the Matter of N.C.,* 909 A.2d 818, 822-23 (Pa. Super. 2006). *See also In the Interest of C.J.R* 782 A.2d 568, 569 (Pa. Super. 2001).

J.P.'s actions throughout the history of this case reflect a disregard for the health and safety of his children. While outwardly seeming to cooperate, his true convictions were exposed

when confronted. This court has no doubt that if given the chance, J.P.'s plan was to reunite with his children, then his wife, and move to North Carolina. J.P.'s credibility was non-existent when he tried to convince this court he would protect his children.

The circumstances which caused the removal of J.P.'s children have not and will not be alleviated. Any evidence of a bond between the father and some of his children is eliminated when compared to the bond between the father and mother, especially when it comes to the children's safety. Although there was less than a year from placement to the Motion to Change Goal, the father demonstrated through his actions that there would not be a rectification of the conditions which led to the children's removal. Any further efforts to reunite the father with his children "would be futile and contrary to the child's best interests". In re J.D.H., 171 A.3d 903, 905, 909-910 (Pa. Super 2017). The five week period between the ordering to begin reunification to the change of goal to adoption was of no consequence as J.P. demonstrated he was not going to make his children's safety a priority in his life. The June unauthorized visit of D.P. with the mother permitted by the father was not a single indiscretion, but rather the culmination of J.P.'s complete and utter failure to be a parent.

The third and fourth issues raised by the father argue the court erred and or abused its discretion in failing to appoint separate legal counsel to advise the court of the children's wishes regarding the change of goal. Counsel for the father had filed the Motion for Special Relief requesting the record be reopened and counsel be appointed for the children. The Motion was based on the recent Superior Court decision in In re J'K.M., 191 A.3d 907 (Pa. Super 2018). The case extended the appointment of separate counsel to represent a child's legal interests, where there was a conflict between the opinions of the child and the Guardian Ad Litem (GAL) of the child, to dependency proceedings. J'K.M. involved a 16 year old child who testified at the

14

Review Hearing that she wished to continue living with the mother. The GAL's position was that removal from home was in the best interests of the child due to the mother neglecting the child's medical needs. **In re J'K.M.**, 191 A.3d at 914-915. The Superior Court detailed the fact that the child was 16 years old, and that competency is presumed at 14. The Court relied heavily on the child's testimony and reasons for her position, namely that she had been sexually assaulted in foster care and felt the system had failed and endangered her. **Id.** As a general rule, the Superior Court determined that "pursuant to **L.B.M., C.P.**, Rule 1154 and its comment, and the specific suspension of Section 6311(b)(9), a divergence between the child's wishes under 42Pa. C.S.A.§ 6311(b)(7), **may** be considered a conflict of interest for the GAL." **Id.** (emphasis supplied). Specifically, the Superior Court noted that "despite child's desire to remain in Mother's care and the ordeals child stated previously had occurred in foster care, the GAL argued against the child remaining at home." **Id.** The Court determined that "this divergence of opinions between the child's legal interests and best interests presents a conflict as contemplated in **L.B.M.** and Pa. R.J.C.P. 1151 and 1154." **Id.**

In this case, the Guardian Ad Litem for the children, Alison Scarpitti, Esq., submitted an extensive report of her meetings with the two oldest children, D.P. and R.P., which report was admitted without objection, as an Exhibit. (*9/9/2018 N.T. p. 30*), see also (*9/9/2018 N.T. pp. 30-32.*). Attorney Scarpitti detailed that the oldest child, D.P, 12 years old, wished to be adopted, but expressed a wish for contact with the father. R.P., aged 9, expressed an objection to adoption; he was not ready to give up hope that J.P. would be able to protect him from the mother. R.P. was unable to fully express any specific reason why he did not want to be adopted , but also expressed he did not believe that the father could keep him safe, a sentiment expressed by D.P. as well. The GAL expressed her opinion that changing the goal to adoption, and thus moving

towards terminating parental rights would be in the best interest of the children. However, she additionally stated in the report, that forcing a child to be adopted would not be in the child's best interests.

The present case is readily distinguishable from **J'K.M.** A 9 year old child, not a 16 year old, has expressed a desire not to be adopted. R.P. has not reached the age of consent, 14 years old, which age the Superior Court noted in **J'K.M.** The child's opinion was fully brought to the court's attention by the GAL who met with him and discussed the issues with R.P. The ruling in **J'K.M.** was that if a conflict between the child and the GAL existed, the court **may** appoint counsel to represent the child's legal interests. Attorney Scarpitti expressed her opinion that a child should not be forced to be adopted, in line with R.P.'s position – no conflict. One thing was clear – R.P. feared his mother and did not want contact with her. He and D.P. questioned their father's ability to protect them from their mother. J.P. will choose his wife over the children every time. Once that fact becomes clear to the children, any equivocation to being adopted will cease. However, this case isn't at that stage yet, only that OCY can pursue termination of parental rights. Based upon the evidence, this court did not err or abuse its discretion in not appointing separate counsel to represent the legal interests of D.P. and R.P., nor in denying the father's Motion for Special Relief.

Issue number 2 in the father's list of Issues Presented on Appeal, maintains the court erred and / or abused its discretion in granting the Motion to Quash the Subpoenas the father had issued for the two oldest children (D.P. and R.P.) to attend and testify in camera at the Review Hearing. Counsel for OCY filed a Motion to Quash the Subpoenas and the court conducted a hearing on the Motion prior to the September 9, 2018 Review Hearing.

Rule 1128 of the Pennsylvania Rules of Juvenile Court Procedure establishes the procedure for the appearance of parties at a dependency hearing.

    A. **General Rule.** All parties shall be present at any proceeding unless the exceptions of paragraph (B) apply.

    B. **Exceptions.**

    (2). *Exclusion from proceedings.* A party may be excluded from a proceeding only for good cause shown. …

The Agency presented the testimony of the family's caseworker, Shannon Spiegel. Ms. Spiegel described how D.P.'s behaviors in the foster home worsened after the unauthorized contact with the mother on Father's Day. She stated that the children were told of the goal change to be requested at the hearing, but neither indicated they wanted to come to the hearing. Both children would get very upset when talking about adoption, and whether they wanted contact with their parents. D.P. would act out, and R.P. would become more withdrawn. Even though the children would not be in the courtroom, they would know why they were there and would become stressed. (*9/9/2018 N.T. pp 5-6,11,12,14-15*).

Jessica Edmunds, the family therapist from Family Based Mental Health confirmed the problems with D.P. after the unauthorized June visit with mom. D.P.'s behaviors increased, and after finding out about the visit, Edmunds concluded there was a correlation between the visit and the escalation in D.P.'s behaviors. The behavior continued to worsen so that D.P. was removed from his foster home and hospitalized for mental health issues. (*9/9/2018 N.T. pp. 24-27*).

Alison Scarpitti, Esq., the children's Guardian Ad Litem, met with D.P. and R.P., and filed a report with the court that was admitted as an exhibit. (*9/9/2018 N.T. p. 30*). As discussed earlier in this opinion, both D.P. and R.P.'s opinions about adoption and contact with their

17

parents were presented to the court. Attorney Scarpitti advocated that the children not be forced to undergo the stress trauma of having to come to court and answer questions. (*9/9/2018 N.T. pp 30-32*).

This court is clearly convinced that good cause was shown to quash the subpoenas for the children's appearance and testimony. The children's positions were competently and professionally presented by Attorney Scarpitti who personally met with the court. The court considered those positions in determining the outcome of the Review Hearing. No error of law or abuse of discretion occurred in granting the Motion to Quash.

The final issue raised by the father on appeal is that the court did not consider the best interests of the children in permitting the change of goal to adoption. This whole matter has been about the best interests of D.P., R.P., J.P. and E.P. Not permitting these children to have to face the continued trauma and instability they have been through in their short lives is the paramount concern of this court. The evidence has clearly shown that J.P. is a con artist when it comes to demonstrating he can care for and protect his children. The father erects a façade that he is cooperating, when all the time he is scheming to reunite with his wife and move out of the jurisdiction with his children. J.P.'s self-confessed addiction to his wife trumps any minimal progress he may have made to regain his children's custody. The father has no inclination to change anything about his parenting or behavior. To place these children back in his care would doom them to a life of trauma, stress and instability. The best interests of these four children lie apart from their parents.

## CONCLUSION

Appellant has continuously demonstrated she cannot or will not place his children's needs above his own. He refuses to accept responsibility for his actions. The skills and judgment

18

necessary to provide for the emotional well-being of his children are non-existent. The total history of this case reveals that the father is unable and / or unwilling to change to give priority to the needs for safety and adequate care for his children. He was given numerous opportunities to demonstrate he would work to be able to provide the necessary basic needs for his children and consistently failed to do so. A goal change to Adoption is therefore appropriate, despite any degree of minimal compliance with the permanency plan. It is respectfully requested the Superior Court affirm this Court's Order changing the goal of the dependency proceeding to Adoption.

Dated this __14th__ day of January, 2019.

BY THE COURT

SHAD CONNELLY, SENIOR JUDGE

cc: Attorney Anthony Vendetti
Erie County Office of Children and Youth
154 West 9th Street
Erie, PA 16501

Attorney Elizabeth Brew Walbridge
1001 State Street, Suite 1400
Erie, PA. 16501

Attorney Emily Merski
3820 Liberty Street
Erie, PA 16509

Attorney Alison Scarpitti
150 East 8th Street, First Floor
Erie, PA 16501

19