J-A20028-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: M.C., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: E.N.C., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 12 MDA 2019 |

Appeal from the Decree Entered December 3, 2018
In the Court of Common Pleas of Cumberland County Orphans' Court at
No(s):  094 Adoptions 2018

| | | |
|---|---|---|
| IN THE INT. OF: M.H., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: E.N.C., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 28 MDA 2019 |

Appeal from the Decree Entered December 3, 2018
In the Court of Common Pleas of Cumberland County Orphans' Court at
No(s):  093 Adoptions 2018

| | | |
|---|---|---|
| IN THE INTEREST OF: M.C., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF:  E.N.C., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 55 MDA 2019 |

Appeal from the Order Entered December 6, 2018
In the Court of Common Pleas of Cumberland County Juvenile Division at
No(s):  CP-21-DP-0000176-2017

| | | |
|---|---|---|
| IN THE INTEREST OF: M.H., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |

J-A20028-19

APPEAL OF: E.N.C., MOTHER

    :    No. 56 MDA 2019

Appeal from the Order Entered December 6, 2018
In the Court of Common Pleas of Cumberland County Juvenile Division at
No(s): CP-21-DP-0000141-2017

BEFORE: GANTMAN, P.J.E., McLAUGHLIN, J., and FORD ELLIOTT, P.J.E.

MEMORANDUM BY McLAUGHLIN, J.:        **FILED OCTOBER 31, 2019**

E.N.C. ("Mother") appeals from the orders changing the dependency goals for her children M.H. (born 2007) and M.C. (born 2015) from reunification to adoption, and the decrees terminating her parental rights to the children. Mother's counsel has filed an Application for Leave to Withdraw and an **Anders**[1] brief. We grant counsel leave to withdraw, and affirm the orders and decrees of the trial court.

The trial court set forth the factual and procedural history in its Pa.R.A.P. 1925(a) opinions, which we adopt and incorporate herein. **See** Trial Court Opinion (In the Interest of M.H.), filed February 8, 2019, at 1-10; Trial Court Opinion (In the Interest of M.C.), filed February 8, 2019, at 1-9.[2] To summarize the procedural history, the court placed M.H. and M.C. in

---

[1] **Anders v. California**, 386 U.S. 738 (1967).

[2] The trial court issued a separate Rule 1925(a) opinion for each child, in which the court explained its reasons for entering both the goal change order and termination decree concerning that child.

- 2 -

emergency protective custody in September and November 2017, respectively, and thereafter adjudicated them dependent. In September 2018, the Cumberland County Children and Youth Services ("CYS") filed a Petition for Goal Change Permanency Hearing for each child and Petition for Involuntary Termination of Parental Rights for each child.

The court held a bifurcated hearing on the petitions on November 28, 2018, and December 3, 2018. Between the two hearings, the court heard testimony from Mother, multiple CYS caseworkers, employees from Mother's parenting education and visitation program, the drug tester for Mother's probation program, M.C.'s foster mother, and M.H. The guardian *ad litem* for the children and the attorney for the children also participated in the proceedings. After the November 28 hearing, the court ordered that the permanency goal for each child be changed to adoption.[3] After the December 3 hearing, it entered decrees involuntary terminating Mother's parental rights to each child. Mother filed a timely notice of appeal from each of the four orders and decrees.[4]

_____

[3] The goal change orders were dated November 28, 2018, but filed upon the trial court docket on December 6, 2018.

[4] The two notices of appeal Mother filed for the goal change orders erroneously stated that the orders were entered on November 28, 2017. We have amended the caption to reflect that the orders were entered on December 6, 2018. **See** note 1, *supra*.

As stated above, Mother's counsel has filed an Application for Leave to Withdraw and an **_Anders_** brief. In the **_Anders_** brief, Mother's counsel presents the issues as follows:

> 1. Did the trial court abuse its discretion and commit an error of law when it found, despite a lack of clear and convincing evidence, that the children's permanent placement goals of reunification were neither appropriate, nor feasible and ordered goal changes to adoption, thus contravening section 6351(f) of the Juvenile Act, 42 Pa.C.S. § 6351(f)?

> 2. Did the trial court abuse its discretion and commit an error of law when it found, despite a lack of clear and convincing evidence, that sufficient grounds existed for a termination of [Mother's] parental rights in the children, and when it failed to primarily consider the children's developmental, physical and emotional needs and welfare, thus contravening sections 2511(a) and 2511(b) of the Adoption Act, 23 Pa.C.S. §§ 2511(a) & 2511(b)?

**_Anders_** Brief at 4 (suggested answers omitted). In the argument section of the brief, counsel elaborates on Mother's position that the court failed to give proper weight to Mother's compliance with her Family Service Plan objectives, failed to assess Mother's progress in light of a similarly situated adult, and disregarded the primary purpose of the Juvenile Act—to preserve family unity. Mother has not responded to the application to withdraw or filed a _pro se_ brief. Appellee, CYS, has submitted a letter in support of the **_Anders_** brief, in lieu of filing its own brief.[5]

---

[5] The guardian _ad litem_ for the children has also submitted a letter in support of the **_Anders_** brief. The attorney for the children has submitted a letter relying on the trial court's Rule 1925(a) opinions.

Before we may address Mother's issues, we must pass on counsel's request to withdraw. ***Commonwealth v. Orellana***, 86 A.3d 877, 879 (Pa.Super. 2014). An ***Anders*** brief that accompanies a request to withdraw must:

(1) provide a summary of the procedural history and facts, with citations to the record;

(2) refer to anything in the record that counsel believes arguably supports the appeal;

(3) set forth counsel's conclusion that the appeal is frivolous; and

(4) state counsel's reasons for concluding that the appeal is frivolous. Counsel should articulate the relevant facts of record, controlling case law, and/or statutes on point that have led to the conclusion that the appeal is frivolous.

***Commonwealth v. Santiago***, 978 A.2d 349, 361 (Pa. 2009); ***see also In re V.E.***, 611 A.2d 1267, 1275 (Pa.Super. 1992) (extending ***Anders*** briefing criteria to withdraw of appointed counsel from involuntary termination of parental rights proceedings).

Counsel must also provide a copy of the ***Anders*** brief to the client, along with a letter that advises the client of the right to: "(1) retain new counsel to pursue the appeal; (2) proceed *pro se* on appeal; or (3) raise any points that the appellant deems worthy of the court[']s attention in addition to the points raised by counsel in the ***Anders*** brief." ***Orellana***, 86 A.3d at 880 (quoting ***Commonwealth v. Nischan***, 928 A.2d 349, 353 (Pa.Super. 2007)). If we determine that counsel has satisfied these requirements, we then examine the record to determine if the appeal is wholly frivolous. ***Commonwealth v.***

*Dempster*, 187 A.3d 266, 271-72 (Pa.Super. 2018) (*en banc*). If we find the appeal is wholly frivolous, we may grant counsel leave to withdraw and dismiss the appeal. *Id.* at 271.

Our review of the instant **Anders** brief reveals that it complies with the necessary requirements. In addition, counsel has served a copy of the brief on Mother, and sent her a letter stating that she has a right to respond to the application to withdraw, raise other issues, and pursue the appeal either on her own or through other counsel. We therefore turn to our own review of whether a non-frivolous issue exists for appeal.

We will first address the termination of Mother's parental rights. Our scope and standard of review in cases involving the termination of parental rights are as follows:

> A party seeking termination of parental rights bears the burden of establishing grounds for termination by clear and convincing evidence. Clear and convincing evidence is evidence that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitation, of the truth of the precise facts in issue. We accept the findings of fact and credibility determinations of the trial court if the record supports them. If the factual findings have support in the record, we then determine if the trial court committed an error of law or abuse of discretion.

*In re Adoption of K.C.*, 199 A.3d 470, 473 (Pa.Super. 2018) (internal quotation marks and citations omitted).

In its Rule 1925(a) opinions, the trial court explained that CYS presented clear and convincing evidence that termination of Mother's parental rights to

M.H. and M.C. was warranted under 23 Pa.C.S.A. §§ 2511(a)(2), (5), and

(8).[6] Specifically, the court found there was ample evidence of Mother's

---

[6] The applicable sections of the statute state as follows:

**(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

* * *

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

* * *

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

* * *

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

"repeated neglect of M.H.'s mental health needs," and Mother's "continued drug use and unaddressed domestic violence and punishment in the home," which left M.H. and M.C. to be without essential parental care. Tr. Ct. Op. (M.H.) at 14; Tr. Ct. Op. (M.C.) at 13. The court found that Mother "has made only minimal strides in achieving her goals and failed in the follow-through in every arena to the extent that the circumstances prompting [CYS's] involvement from the start continued to exist, over a year after [CYS's] intervention." Tr. Ct. Op. (M.H.) at 14; Tr. Ct. Op. (M.C.) at 13. The court also found the evidence indicated that Mother "will not remedy these conditions within a reasonable period of time, given [Mother's] lack of willingness to accept her role in [CYS's] involvement and failure to make any significant progress to remedy the circumstances thereto in the 14 months [Mother] had to make those changes." Tr. Ct. Op. (M.H.) at 14; Tr. Ct. Op. (M.C.) at 13.

The court also found that termination of Mother's parental rights was in the children's best interests, as required by 23 Pa.C.S.A. § 2511(b).[7]

_____

23 Pa.C.S.A. § 2511(a)(2), (5), (8).

[7] This portion of the termination statute requires the court to consider the following:

> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant

Regarding M.H., the court observed that "[t]estimony from the current caseworker, the initial caseworker, the guardian *ad litem*, the attorney for the child, the [parental education program] visitation supervisor, the parent educator, and M.H. herself evidenced that M.H.'s best interests cannot be vindicated in [Mother's] care," and that the evidence shows that it is in M.H.'s best interest to permanently place her "with a family that can care for M.H. and provide for her the stable, permanent, and safe home that an 11-year-old child requires." Tr. Ct. Op. (M.H.) at 15.

Regarding M.C., the court stated it "heard the testimony of the caseworkers, the foster mother, the guardian *ad litem*, the attorney for [the children], and others," which indicated "that prolonging the status of [Mother's] parental rights would be detrimental to M.C., given [Mother's] failure to improve on, or even recognize, [CYS']s and this [c]ourt's concerns for M.C.'s well-being in her care." Tr. Ct. Op. (M.C.) at 14. The court noted that "M.C. is three years old and has been loved and cared for by her foster parents for over a year of her young life[, and they] can and do provide the child with the stability, permanency, safety, and affection she needs." *Id.*

After a thorough review of the certified record, the submissions of the parties, and the relevant law, we conclude that the trial court did not commit

---

to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(b).

an error of law or abuse of discretion in involuntary terminating Mother's parental rights to M.H. and M.C. The trial court's conclusions are supported by clear and convincing record evidence, and our independent review has not uncovered any non-frivolous issues for appeal. We therefore affirm the decrees terminating Mother's parental rights on the basis of the well-reasoned opinions of the Honorable Christylee L. Peck, which we adopt and incorporate herein. **See** Tr. Ct. Op. (M.H.) at 10-15; Tr. Ct. Op. (M.C.) at 9-14.

We next address the orders changing the children's permanency goals to adoption. We review such orders for an abuse of discretion. ***In re C.J.R.***, 782 A.2d 568, 569 (Pa.Super. 2001). When reviewing a goal change order, "we are bound by the facts as found by the trial court unless they are not supported in the record." ***Id.*** (quoting ***In the Interest of A.P.***, 728 A.2d 375, 378 (Pa.Super. 1999)). A trial court considering a goal change "must focus on the child and determine the goal in accordance with the child's best interests and not those of his or her parents." ***Id.*** (quoting ***A.P.***, 728 A.2d at 378).

In its Rule 1925(a) opinions, the trial court explained that the goal changes were warranted under 42 Pa.C.S.A. § 6351(e), (f), (f.1), and (g).[8] **See** Tr. Ct. Op. (M.H.) at 16; Tr. Ct. Op. (M.C.) at 16. The court stated it

---

[8] These sections guide a court's analysis at a permanency review hearing, and provide that a court shall determine the placement or disposition "which is best suited to the safety, protection and physical, mental and moral welfare of the child," based on such factors as the "appropriateness, feasibility and extent of compliance with the permanency plan," "extent of progress made toward alleviating the circumstances which necessitated the original placement," and the "appropriateness and feasibility of the current placement goal for the child." **See** 42 Pa.C.S.A. § 6351(e), (f), (f.1), and (g).

ordered the goal changes because during CYS's attempts at reunification, which lasted over a year for each child, Mother "demonstrated an unwillingness to change the circumstances that led to [CYS's] involvement because of, evidently, her belief that she is not in need of [CYS's] services and that [CYS's] concerns have somehow been contrived from the start or the result of fabrications on the part of M.H." Tr. Ct. Op. (M.H.) at 17; **see also** Tr. Ct. Op. (M.C.) at 16. The court also noted the unsanitary and unsafe conditions of Mother's home in March 2018; her use of methamphetamines from March through November 2018; her refusal to obtain a drug and alcohol assessment; and her failure to attend visits with the children. Tr. Ct. Op. (M.H.) at 17-18; Tr. Ct. Op. (M.C.) at 16-17. The court concluded that reunification with Mother was "not feasible nor in the best interests of the child[ren]" and that the goal change was appropriate "based on [Mother]'s lack of progress toward the most critical goals [CYS] set for her and discussed with her repeatedly." Tr. Ct. Op. (M.H.) at 18; Tr. Ct. Op. (M.C.) at 17.

After a thorough review of the certified record, the submissions of the parties, and the relevant law, we conclude that the trial court did not abuse its discretion in ordering the permanency goals for M.H. and M.C. be changed to adoption. The trial court's conclusions are supported by the record, and our independent review has not uncovered any non-frivolous issues for appeal. We therefore affirm the goal change orders on the basis of the well-reasoned opinions of the Honorable Christylee L. Peck, which we adopt and incorporate herein. **See** Tr. Ct. Op. (M.H.) at 15-18; Tr. Ct. Op. (M.C.) at 14-17.

Orders and decrees affirmed. Application for Leave to Withdraw granted.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/31/2019

IN THE INTEREST OF M.C., : IN THE COURT OF COMMON PLEAS OF
  a Minor    : CUMBERLAND COUNTY, PENNSYLVANIA
          :
          :
Appeal of E.C., Mother  : 176-DP-2017

## OPINION PURSUANT TO PA.R.A.P. 1925

Peck, J., February _8_ , 2019 –

On November 17, 2017, M.C. was placed in emergency protective custody of Cumberland County Children and Youth Services (CCCYS, or the Agency),[1] and subsequently placed in shelter care on November 20, 2017.[2] On November 30, 2017, M.C. was ordered dependent.[3] The Agency, by and through its solicitor, Lindsay D. Baird, Esquire, filed a Petition for Goal Change Permanency Hearing on September 4, 2018,[4] and a Petition for Involuntary Termination of Parental Rights of Appellant on November 15, 2018.[5]

This Court held a hearing on the Agency's goal change and termination petitions over the course of two days on November 28, 2018 and December 3, 2018. This Court ordered a goal change from reunification to adoption on November 28, 2018.[6] At the close of the December 3, 2018 hearing and on consideration of the evidence, this Court terminated Appellant's parental rights by Final Decree as to both of her children.[7] Appellant filed a Notice of Appeal and Statement of Matters Complained of on Appeal on December 28, 2018, complaining that this Court erred in terminating Appellant's

---

[1] Order for Emergency Protective Custody, November 17, 2017 (Peck, J.).

[2] CCCYS Exhibit No. 1, Recommendation for Shelter Care, November 20, 2017 (adopted by this Court by Order dated November 27, 2017).

[3] CCCYS Exhibit No. 1, Recommendation for Adjudication and Disposition – Child Dependent, November 30, 2017 (adopted by Order by this Court by Order dated December 6, 2017).

[4] Petition for Goal Change Permanency Hearing, September 4, 2018.

[5] Petition for Involuntary Termination of Parental Rights of E.C. Under Section 2512 of the Adoption Act, November 15, 2018.

[6] Permanency Review Order, November 28, 2018 (Peck, J.).

[7] Re: Petition for Involuntary Termination of Parental Rights of E.C. Under Section 2512 of the Adoption Act, In Re: Adoption of M.C., Final Decree, December 3, 2018 (Peck, J.); Re: Petition for Involuntary Termination of Parental Rights of E.C. Under Section 2512 of the Adoption Act, In Re: Adoption of M.H., Final Decree, December 3, 2018 (Peck, J.).

parental rights, as well as in ordering a goal change to adoption.[8] Appellant complains as follows:

> The trial court abused its discretion and committed an error of law when it found, despite a lack of clear and convincing evidence, that sufficient grounds existed for a termination of appellant's parental rights in her child, and when it failed to primarily consider the child's developmental, physical and emotional needs and welfare, thus contravening sections 2511(a) and 2511(b) of the Adoption Act, 23 Pa.C.S.A. §§ 2511(a) & 2511(b).[9]

> The trial court abused its discretion and committed an error of law when it found, despite a lack of clear and convincing evidence, that the child's permanent placement goal of reunification was neither appropriate, nor feasible and ordered a goal change to adoption, thus contravening section 6351(f) of the Juvenile Act, 42 Pa.C.S.A. § 6351(f).[10]

Pursuant to Pa. R.A.P. 1925(a), this Opinion is written in support of this Court's judgment.

## STATEMENT OF FACTS

a. Background

Appellant is the biological mother of M.C., born in 2015. Agency involvement began with M.C.'s older sibling ("M.H.") in September of 2017 when the Agency received a referral based on Appellant's failure to meet M.H.'s mental health needs, as well as concerns with the "deplorable" condition of the family home,[11] Appellant's drug use, and domestic violence and inappropriate punishment in the home.[12] At that time, M.C.

---

[8] Concise Statement of Matters Complained of on Appeal, December 28, 2018 (Orphan's Court docket); Concise Statement of Matters Complained of on Appeal, December 28, 2018 (dependency docket).

[9] Concise Statement of Matters Complained of on Appeal, December 28, 2018 (Orphan's Court docket).

[10] Concise Statement of Matters Complained of on Appeal, December 28, 2018 (dependency docket).

[11] Findings of fact at the adjudicatory hearing for M.C.'s dependency included an Agency caseworker's description of the home as having "a strong odor of animal urine, piles of trash and clothing, a flea infestation, and a propane heater serving as the source of heat." CCCYS Exhibit No. 1, Recommendation for Adjudication and Disposition – Child Dependent, November 30, 2017 (adopted by this Court by Order dated December 6, 2017).

[12] CCCYS Exhibit No. 1, Recommendation for Shelter Care, November 20, 2017 (adopted by this Court by Order dated November 27, 2017); CCCYS Exhibit No. 1, Recommendation for Adjudication and

2

became the subject of a Safety Plan with the Agency wherein Appellant's contact with M.C. was to be supervised.[13] On November 16, 2017, the Agency became aware of M.C.'s unsupervised presence in Appellant's home, and M.C. was placed in emergency protective custody on November 17, 2017 and subsequently in shelter care on November 20, 2017.[14] M.C. was ordered dependent on November 30, 2017.[15]

Throughout Agency involvement, the permanency plans in place each had the primary goal of reunification.[16] The Agency's Initial Family Service Plan for Appellant was developed on October 27, 2017, with continued revisions through June 18, 2018.[17] At the time of the termination and goal change hearing, as testified to by CCCYS caseworker Debra Zervanos, Appellant's Family Service Plan recommended that Appellant obtain and maintain adequate and safe housing, work toward improving the parent-child relationship, eliminate domestic violence and inappropriate discipline in the home, achieve drug and alcohol sobriety, achieve mental health stability, and cooperate with the Agency and the criminal justice system.[18] Appellant took some measures to meet her goals, but failed in the follow-through of the Agency's and this Court's most critical concerns, including continued drug use, lack of progress in her own mental health, and failure to recognize her role in Agency involvement or cooperate with the Agency to work toward reunification.

---

Disposition – Child Dependent, November 30, 2017 (adopted by this Court by Order dated December 6, 2017); Transcript of Proceedings, In Re: Termination of Parental Rights/Goal Change/Permanency Review, November 28, 2018, at 35 (Peck, J.) (hereinafter "N.T. I at ___."). See also Petition for Involuntary Termination of Parental Rights of E.C. Under Section 2512 of the Adoption Act, November 15, 2018.

[13] CCCYS Exhibit No. 1, Recommendation for Adjudication and Disposition – Child Dependent, November 30, 2017 (adopted by this Court by Order dated December 6, 2017).

[14] Order for Emergency Protective Custody, November 17, 2017 (Peck, J.); CCCYS Exhibit No. 1, Recommendation for Shelter Care, November 20, 2017 (adopted by this Court by Order dated November 27, 2017).

[15] CCCYS Exhibit No. 1, Recommendation for Adjudication and Disposition – Child Dependent, November 30, 2017 (adopted by this Court by Order dated December 6, 2017).

[16] CCCYS Exhibit No. 5, Initial Child's Permanency Plan dated January 10, 2018, revised January 16, 2018, June 19, 2018.

[17] CCCYS Exhibit No. 7, Initial Family Service Plan dated October 27, 2017, revised January 16, 2018, June 18, 2018.

[18] CCCYS Exhibit No. 7, Family Service Plan dated June 18, 2018.

3

This Court held a goal change and termination hearing over two days, on November 28, 2018 and December 3, 2018, based on the Agency's petitions to change the permanency goal to adoption and to terminate Appellant's parental rights. This Court ordered a goal change from reunification to adoption on November 28, 2018.[19] At the close of evidence, this Court terminated Appellant's parental rights on December 3, 2018.[20]

b. Appellant's Status at the Time of the Termination Hearing

Appellant was expected to maintain adequate and safe housing, work toward improving the parent-child relationship, eliminate domestic violence and inappropriate discipline in the home, achieve drug and alcohol sobriety, achieve mental health stability, and cooperate with the Agency and criminal justice system.[21]

Agency concerns with housing stemmed most critically from the unsanitary condition of the home, the amount of accessible weapons that Appellant and her paramour display in the home, as well as the lack of an appropriate bedroom for Appellant's children.[22] As to weaponry, Appellant and her paramour display knives on the wall of their bedroom and had a BB gun accessible to the children in the kitchen on top of the refrigerator.[23] Testimony at the termination and goal change hearing showed that at the time of initial Agency involvement, Appellant's bedroom door was left ajar to allow heat from the kerosene heater in the living room to heat all of the home, and the knives were therefore accessible to the children.[24]

An unannounced Agency home-visit in September of 2017 showed debris, garbage, and old food lying about, and the bedroom for the children consisted of only a mattress on the floor.[25] By March of 2018, still posing concerns in the home were various car

---

[19] Permanency Review Order, November 28, 2018 (Peck, J.).

[20] Re: Petition for Involuntary Termination of Parental Rights of E.C. Under Section 2512 of the Adoption Act, Final Decree, December 3, 2018 (Peck, J.).

[21] CCCYS Exhibit No. 7, Family Service Plan dated June 18, 2018.

[22] N.T. I at 38, 49-50.

[23] Id. at 50, 70.

[24] Id.

[25] Transcript of Proceedings, In Re: Continued Termination of Parental Rights/Goal Change/Permanency Review, December 3, 2018, at 92-93 (Peck, J.) (hereinafter "N.T. II at ___.").

parts, including blow torches, and dog feces.[26] At the termination hearing, Appellant presented recent photographs she took of the inside of the home, showing progress she made about a year after initial Agency involvement, including a bedroom for the children.[27] Appellant testified that, contrary to the Agency's records and testimony, she kept the bedroom door locked since the lock was recommended to her by crisis care staff during an incident concerning her older child.[28]

Appellant obtained a parenting assessment; the resulting recommendation was that she obtain a psychological evaluation, obtain a drug evaluation, and participate in the parenting education program.[29] Appellant's parent educator in the program, Erin Brown of Alternative Behavior Consultants ("ABC"), testified that it took her two weeks to get return contact from Appellant to begin the program.[30] Subsequently, Appellant was a no-show for the first and third sessions.[31] Appellant did ultimately complete the parenting program, but Ms. Brown testified that Appellant showed lack of accountability or focus on the children during those sessions. Ms. Brown reported that "a lot of the sessions circled around her relationship with [her paramour]," and that "[t]here were times where . . . she would place all the blame on one of the children instead of taking any responsibility for things."[32] Ms. Brown explained that the blame centered mostly on M.C.'s older sibling, and that Appellant "made no mention of [']I did this so ABC occurred.[']."[33] Instead, "[i]t was more so [M.H.] has a history of not telling the truth. And [M.H.] has done this and [M.H.] has done that. So it was all focused around what [M.H.] has done to lead us to that point."[34]

---

[26] Id. at 11.

[27] See, e.g., id. at 20-21. The ABC supervisor noted that the recent photos depicted the home "look[ing] remarkably different now in these photographs." Id. at 21.

[28] Id. at 28.

[29] N.T. I at 31.

[30] N.T. II at 7.

[31] Id.

[32] Id. at 8.

[33] Id. at 9.

[34] Id.

Appellant was offered 48 supervised visits with M.C. between January 2018 and November of 2018, and attended 30 of those.[35] Three of the eighteen missed visits were based on the foster parents' inability to bring the child rather than on the part of Appellant.[36] To Appellant's credit, the visitation supervisor testified that Appellant engaged well with the child and always came prepared with a snack for her.[37] However, Appellant was late for 47% of the visits she attended with M.C., and on some missed visits simply did not appear without calling to cancel, which resulted in the supervisor thereafter requiring Appellant to appear for the visits before ABC called the foster family to bring M.C.[38] The supervisor testified that Appellant "found that that was too much for her to do. She couldn't come and sit for the hour, so we never did fulfill that obligation."[39]

As to mental health, Appellant's parenting assessment resulted in a recommendation to obtain a psychological evaluation, and the Family Service Plan additionally listed a goal for Appellant to obtain a mental health assessment and follow all resulting recommendations.[40] In March of 2018, Appellant sent the Agency caseworker an evaluation that did not include any input from the Agency or show any indication of psychological testing.[41] Appellant testified that she was aware the document was unacceptable to the Agency as an evaluation, but did not obtain any further evaluations because she disagreed that the evaluation lacked Agency input.[42]

Appellant is routinely testing positive for methamphetamines. Appellant was participating in drug screens from March 2018 through the time of the termination hearing in November 2018.[43] Appellant's first screening was on March 13, 2018 when

---

[35] N.T. I at 21.

[36] Id.

[37] Id.

[38] Id. at 21-23.

[39] Id. at 22.

[40] Id. at 31, 38. The Agency included the mental health goal in the Family Service Plan because M.H. reported that Appellant had threatened to harm herself and because of the parenting assessment recommendation. Id. at 41.

[41] Id. at 40-41.

[42] N.T. II at 40-41.

[43] N.T. I at 10.

6

she tested positive for methamphetamines and subsequently failed to appear for screenings for three months.[44] Thereafter, Appellant again tested positive for methamphetamines on June 27, July 12, September 14, September 18, September 26, October 4, October 15, October 24, and November 8 of 2018.[45] In the midst of the screens, in August of 2018, the caseworker sent Appellant notice that she would be removed from the program for failing to appear at appointments for screenings.[46] The Restorative Sanctions Coordinator who supervised the drug screens testified that she told Appellant multiple times that she could get Appellant help, given her repeated positive screens, but Appellant denied using meth other than stating she once accidentally ingested meth when she used a friend's vape.[47]

Appellant completed three drug and alcohol evaluations but failed to follow through with the recommendations. The evaluations from May 5, 2018 and August 2, 2018 recommended outpatient groups for Appellant, but Appellant did not comply and was therefore discharged against advice.[48]Appellant's August 31, 2018 evaluation recommended inpatient treatment, but Appellant again failed to comply.[49] Appellant testified that she "never received paperwork in the mail" from the first evaluation, that she did not comply with a recommendation for group in the second evaluation because the meeting time interfered with visits with her children and with her work schedule, and that the third evaluation was "coerced" by the Agency.[50] Appellant stated that she ultimately obtained a fourth assessment because she disagreed with the third assessment's recommendation to participate in inpatient treatment.[51] At the time of the termination hearing, Appellant stated she was planning to go to group meetings.[52]

---

[44] Id.
[45] Id.
[46] Id. at 40.
[47] Id. at 16, 82.
[48] Id. at 39.
[49] Id. at 39-40.
[50] N.T. II at 37-48.
[51] Id. at 38-39.
[52] Id. at 39-40.

7

As to domestic violence, the Agency's concerns stemmed from M.C.'s older sibling's statements to the initial caseworker that Appellant would threaten suicide when Appellant and her paramour argued, which they frequently did, and that M.C.'s sibling witnessed Appellant's paramour pull Appellant by the hair on at least one occasion.[53] M.C.'s sibling also stated that Appellant's paramour turned off the electricity during an argument with Appellant, which resulted in M.C. tripping over a cinder block and injuring herself inside the home.[54] M.C.'s sibling also stated that M.C. was present on occasions of Appellant throwing objects at M.C.'s sibling, that Appellant has hit M.C.'s sibling with a metal hanger across her back, and that Appellant's paramour has hit M.C.'s sibling with a wooden post and required her to hold and carry cinder blocks for punishment.[55] M.C.'s sibling additionally stated that Appellant's paramour "used to hit [M.C.] a lot, like a lot. If she was just doing something that like any 1-year-old would do, like touch things, grab things because they don't know what they are grabbing, she would get slapped for it. Like if it was just like the simplest thing like a pencil, she would get slapped."[56] The extent of Appellant's progress consists of Appellant giving the caseworker a certificate several years old showing she completed a domestic violence session, as Appellant felt she needed no more counseling in that area.[57] Appellant denies any domestic violence persists in the household.[58]

Appellant ultimately failed to alleviate concerns that led to Agency involvement or make significant progress on her goals.

c. M.C.'s Status at the Time of the Hearing

M.C. just turned three years old. She is outgoing, extremely social, and doing very well with her foster parents,[59] whom she calls "Mommy and Daddy."[60] M.C. has lived with her foster parents and their biological son, as well as a dog and cat, for over a year

---

[53] Id. at 91.
[54] Id. at 92.
[55] Id. at 80-81, 93.
[56] Id. at 82.
[57] Id. at 39.
[58] Id.
[59] N.T. I at 49.
[60] Id. at 85.

8

prior to the termination hearing when she was less than two years old.[61] The foster parents love the child and intend to adopt her.[62] The foster parents' son is seven years older than M.C., shares a birthday with M.C., and M.C. enjoys playing with him.[63] M.C. goes to daycare during the day where she learns the alphabet, colors, and numbers, and at home she enjoys taking care of her baby dolls and putting them to bed.[64] The foster parents will continue visits with M.C.'s older sibling, and are open to visits between M.C. and Appellant in the future if the "[biological] family is healthy and able to be around her."[65] The Agency was unable to place M.C. and her sibling together, but the children see each other on a regular basis and their respective foster families are in ongoing contact.[66]

## DISCUSSION

### a. Sufficiency of Evidence of Statutory Ground Under 23 Pa.C.S. § 2511(a)

This Court begins by addressing the standard of review applicable to Appellant's claims. Pennsylvania appellate courts "adhere[] to the view that the trial court is in the best position to determine credibility, evaluate the evidence, and make a proper ruling." In re R.I.S., 36 A.3d 567, 572 (Pa. 2011) (internal citations omitted). Absent an abuse of discretion or error of law, where the trial court's findings are supported by competent evidence, an appellate court must affirm the trial court even though the record could support the opposite result. In the Interest of R.J.T., 9 A.3d 1179, 1190 (Pa. 2010). Pennsylvania courts have held that "an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." In re Adoption of S.P., 47 A.3d 817, 826 (Pa. 2012) (internal citations omitted).

---

[61] Id. at 54, 84-85; CCCYS Exhibit No. 1, Recommendation for Shelter Care, November 20, 2017 (adopted by this Court by Order dated November 27, 2017).
[62] N.T. I at 84.
[63] Id.
[64] Id.
[65] Id. at 87.
[66] Id. at 46.

9

Appellant argues that this Court erred in terminating her parental rights under 23 Pa.C.S. § 2511(a) and (b), and that this Court erred in ordering the goal change to adoption.[67] We begin by addressing the termination of parental rights. When evaluating a petition for termination of parental rights, a court must conduct a two-part analysis. First, a court must determine if the Agency has proven that at least one of the statutory grounds of termination set out in 23 Pa.C.S. § 2511(a) has been met. See In re B.L.W., 843 A.3d 380, 384 (Pa. Super. 2004) (*en banc*). Second, the court must evaluate whether the termination is in the best interest of the child, as required by 23 Pa.C.S. § 2511(b). Id. The burden is on the Petitioner to prove by clear and convincing evidence[68] that the asserted grounds for seeking the termination of parental rights are valid. In re R.N.J., 985 A.2d 273, 276 (Pa. Super. 2009). Appellant argues that the Agency failed to meet the statutory grounds for termination of parental rights under 23 Pa.C.S. § 2511(a) and (b).

The fulfillment of any one subsection of Section 2511(a) satisfies a threshold sufficient for a court to proceed to evaluate the best interests of the child under Section 2511(b). In re B.L.W., 843 A.3d 380, 384 (Pa. Super. 2004) (*en banc*). The Agency alleged in its Petition the following grounds under Section 2511(a) to terminate Appellant's parental rights:

I. 23 Pa.C.S.A 2511 a (2): The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for the child's physical or mental well-being and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

II. 23 Pa.C.S.A 2511 a (5): The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to

---

[67] Concise Statement of Matters Complained of on Appeal, December 28, 2018 (Orphan's Court docket); Concise Statement of Matters Complained of on Appeal, December 28, 2018 (dependency docket).

[68] "Before terminating a parent's rights, the trial court must receive testimony 'that is so clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.'" In re Adoption of A.C., 162 A.3d 1123, 1133 (Pa. Super. 2017) (quoting *In re Adoption of Atencio*, 650 A.2d 1064, 1066 (Pa. 1994)).

10

exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time, and termination of the parental rights would best serve the needs and welfare of the child.

III. 23 Pa. C.S.A 2511 a (8): The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, twelve months or more have lapsed from the date of the removal or placement, the conditions which led to the removal or placement of the child continue to exist, and termination of parental rights would best serve the needs and welfare of the child.[69]

In this case, M.H. was placed in emergency protective custody of the Agency on November 17, 2017[70] and in shelter care on November 20, 2017, [71] over a year prior to the termination of Appellant's parental rights on December 3, 2018.[72] Initial Agency involvement and concerns began with Appellant's responses to M.C.'s older sibling's mental health needs, inappropriate housing for the children, domestic violence and inappropriate discipline in the home, and Appellant's drug use.[73] Over the course of Agency involvement exceeding one year, Appellant failed to meet most of the Agency's goals for Appellant to reunify with M.C. and summarily denied the existence of many of the Agency's safety concerns. Appellant's lack of sense of responsibility in Agency involvement manifested itself into lack of cooperation or willingness to address the issues prompting and perpetuating M.C.'s placement outside of Appellant's home.

---

[69] Petition for Involuntary Termination of Parental Rights of E.C. Under Section 2512 of the Adoption Act, November 15, 2018.

[70] Order for Emergency Protective Custody, November 17, 2017 (Peck, J.).

[71] CCCYS Exhibit No. 1, Recommendation for Shelter Care, November 20, 2017 (adopted by this Court by Order dated November 27, 2017).

[72] Re: Petition for Involuntary Termination of Parental Rights of E.C. Under Section 2512 of the Adoption Act, Final Decree, December 3, 2018 (Peck, J.).

[73] CCCYS Exhibit No. 1, Recommendation for Shelter Care, November 20, 2017 (adopted by this Court by Order dated November 27, 2017); CCCYS Exhibit No. 1, Recommendation for Adjudication and Disposition – Child Dependent, November 30, 2017 (adopted by this Court by Order dated December 6, 2017); N.T. 1 at 35. See also Petition for Involuntary Termination of Parental Rights of E.C. Under Section 2512 of the Adoption Act, November 15, 2018.

11

Appellant's overall progress with her goals can be summarized by a statement the caseworker made at the termination hearing:

> I think she tries. I think [Appellant] starts. It's the follow-through, the completion. . . . And in fact, very recently I even sent her a letter and tried to step by step [tell Appellant] what needed to be done, all the objectives that she needed to still do to complete. When we were out at her home, we did that. We had a team meeting following the last hearing, so there were opportunities. . . . I think [Appellant] will schedule a drug and alcohol evaluation [for example], and then maybe she'll be late to it; and it will need to be rescheduled or maybe she'll forget or maybe she'll go and do that part, but then not do the recommendations. So we often just start. It just doesn't follow through.[74]

Appellant's progress has been minimal. Appellant refuses to follow recommendations based on her disagreement with the same. Appellant was expected to improve the parent-child relationship with M.C., but failed to consistently appear to such a degree that ABC required Appellant to appear on-site before ABC would call the foster family to bring M.C. However, Appellant found this, too, overly burdensome.[75]

Appellant's parenting skills assessment resulted in a recommendation to attend a parenting skills course, for which Appellant missed two of the first three appointments.[76] When Appellant did appear and complete the program, she placed blame on her oldest child for Agency involvement,[77] leading the parent educator to have concerns with Appellant's ability to make strides without "some sort of understanding of what [her] part or role is in a situation."[78]

Appellant's denial of responsibility for the conditions leading to M.C.'s removal reverberated throughout Agency involvement, preventing Appellant from meeting her Family Service Plan goals. Appellant tested positive for methamphetamines in March of 2018, missed three months of testing, and then again tested positive in June, July,

---

[74] N.T. I at 71-72.
[75] Id. at 22.
[76] N.T. II at 10.
[77] Id. at 8-9.
[78] Id. at 16.

12

September, October, and November of 2018 just prior to the termination hearing.[79] Appellant, however, refused help and denied using meth other than an "accidental ingestion" around the time of the Agency referral in September of 2017.[80] Appellant additionally failed to meet her mental health goal for failure to allow the Agency adequate input into her mental health evaluation.[81]

Since M.C. was removed from Appellant's care, Appellant has made only minimal strides in achieving her goals and failed in the follow-through in every arena to the extent that the circumstances prompting Agency involvement from the start continue to exist, over a year after Agency intervention. Accordingly, Section 2511(a)(8) is satisfied. The Agency has also proven by clear and convincing evidence that Appellant will not remedy these conditions within a reasonable period of time, given Appellant's lack of willingness to accept her role in Agency involvement and failure to make any significant progress to remedy the circumstances leading thereto in the excess of one year that Appellant had to make those changes. Section 2511(a)(5) is therefore satisfied. Finally, the Agency satisfied Section 2511(a)(2) by clear and convincing evidence given Appellant's continued drug use and unaddressed domestic violence and punishment in the home, leading M.C. to be without essential parental care. Given Appellant's denial of responsibility for her role in the circumstances, it appears such neglect of M.C. will not be remedied in the future.

With at least one of the statutory grounds met pursuant to 23 Pa.C.S. § 2511(a), this Court turned to Section 2511(b)—whether termination serves the best interests of the child, as discussed *infra*.

b. Sufficiency of Evidence that Termination of Parental Rights was in the Child's Best Interest

Section 2511(b) requires that this Court determine whether termination is in the best interests of the child. A trial court "shall give primary consideration to the

---

[79] N.T. I at 8-10.

[80] Id. at 16, 82.

[81] N.T. II at 40-41.

13

developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). See also In re B.L.W., 843 A.3d 380, 384 (Pa. Super. 2004) (*en banc*) (outlining the two-step analysis). Furthermore, "the rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent." 23 Pa.C.S. § 2511(b). Pennsylvania appellate courts have stated that the emotional needs and welfare of the child have properly been interpreted to include "intangibles such as love, comfort, security, and stability." In re K.M., 53 A.3d 781, 791 (Pa. Super. 2012). When making a Section 2511(b) determination, the courts are to focus on the child, not the parent. In Re Adoption of C.L.G., 956 A.2d 999, 1008 (Pa. Super 2008) (*en banc*).

This Court finds competent evidence in the record that it is in M.C.'s best interests to terminate Appellant's parental rights and allow for her to be adopted by her foster parents. M.C. is three years old and has been loved and cared for by her foster parents for over a year of her young life. It is M.C.'s developmental, physical, and emotional needs that must drive this Court's analysis, which each point to her foster parents who can and do provide the child with the stability, permanency, safety, and affection she needs. This Court heard the testimony of the caseworkers, the foster mother, the guardian *ad litem*, the attorney for child, and others, who each led this Court to rule that prolonging the status of Appellant's parental rights would be detrimental to M.C., given Appellant's failure to improve on, or even recognize, the Agency's and this Court's concerns for M.C.'s well-being in her care. Appellant's conduct over the past year, including her push-back against Agency services to help her reunify with M.C. and her continued drug use, leaves this Court without confidence that Appellant is willing or able to provide M.C. with safe or stable care. M.C. is being lovingly cared for by her foster family, where she has been for over a year. It is in M.C.'s best interests to remain there and be permitted the familial permanency she needs. The Agency has proven, by clear and convincing evidence, that it is in the best interests of the child to terminate Appellant's parental rights pursuant to 23 Pa.C.S. § 2511(b).

14

c. Goal Change to Adoption and Appellant's Progress

Finally, Appellant complains on appeal,

> The trial court abused its discretion and committed an error of law when it found, despite a lack of clear and convincing evidence, that the child's permanent placement goal of reunification was neither appropriate, nor feasible and ordered a goal change to adoption, thus contravening section 6351(f) of the Juvenile Act, 42 Pa.C.S.A. § 6351(f).[82]

When considering a petition for a goal change to adoption of a dependent child, the trial court will evaluate:

> the continuing necessity for and appropriateness of the placement; the extent of compliance with the service plan developed for the child; the extent of progress made towards alleviating the circumstances that necessitated the original placement; the appropriateness and feasibility of the current placement goal for the child; and a likely date by which the goal for the child might be achieved.

In Interest of A.N.P., 155 A.3d 55, 66 (Pa. Super 2017) (internal citations omitted).

Although reunification of the family is the primary permanency goal, the Juvenile Act mandates the arrangement of "another alternative permanent family when the unity of the family cannot be maintained." 42 Pa.C.S. § 6301(b). Accordingly, reuniting a child with his or her biological parent(s) rather than changing the goal to adoption should not become "rigid adherence to the principle regardless of the circumstances." In re J.S.W., 651 A.2d 167, 170 (Pa. Super 1994). Changing a child's goal to adoption is based on the policy that "[a] child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting." In re Adoption of M.E.P., 825 A.2d 1266, 1276 (Pa. Super. 2003). If a child welfare Agency has made reasonable efforts at reunification that have failed, then within 18 months, the Agency must redirect its efforts toward *finalizing* permanency for the child in an adoptive home. In re G.P.-R., 851 A.2d 967 (Pa. Super. 2004) (emphasis added). The trial court looks to subsections

---

[82] Concise Statement of Matters Complained of on Appeal, December 28, 2018 (dependency docket).

15

6351(e), (f), (f.1), and (g) of the Juvenile Act[83] to determine the permanency goal that is "best suited to the safety, protection, and physical, mental, and moral welfare of the Child." In Interest of A.N.P., 155 A.3d at 67. The best interests of the child must direct the Court's reasoning, and the "[s]afety, permanency, and well-being of the child must take precedence over *all* other considerations, including the rights of the parents." In re A.K., 906 A.2d 596 (Pa. Super. 2006); In re N.C., 909 A.2d 818, 823 (Pa. Super 2006) (emphasis in original).

This Court's decision to order the goal change to adoption was not one of determining that the child has waited long enough for permanency, though M.C. has, or that the time when Appellant will be able to appropriately care for and ensure the safety and developmental well-being of the child is at some time too far into the future. This Court ordered the goal change because of sufficient evidence that such a time will not come. Appellant has demonstrated an unwillingness to change the circumstances that led to Agency involvement because of, evidently, her belief that she is not in need of Agency services and that the Agency's concerns have somehow been contrived from the start or the result of fabrications on the part of M.C.'s older sibling. Over one year has passed between M.C.'s removal from Appellant's care and the goal change to adoption permanency. As discussed in the above sections of this Opinion, Appellant is unwilling to accept her role in Agency involvement and has refused to accept or act on recommendations made to her in the Agency's effort to reunify Appellant with the child.

In March of 2018, Agency visits to the house still showed dog feces in the home, blow torches and car parts lying about, the plethora of decorative knives still present and accessible to the children, and no appropriate bedroom for Appellant's children.[84] Appellant tested positive for methamphetamines from March of 2018 through November of 2018, and denies any drug use at all outside of "accidentally ingesting meth" once prior to Agency involvement.[85] Appellant refused to obtain a drug and alcohol

---

[83] See 42 Pa.C.S. § 6351.
[84] N.T. II at 11.
[85] N.T. I at 10, 16, 82; N.T. II at 39.

assessment and follow up on recommendations based on her disagreement with the same and insistence she does not need help.[86] Appellant was expected to improve her relationship and attend visits with M.C., but missed 15 of those offered and at times failed to appear without warning.[87] The Agency eventually asked that she appear at visits before M.C. was brought in to see Appellant, but Appellant could not do so when it meant arriving and then waiting for the child's arrival.[88] Appellant was asked to attend parenting education services, but spent, according to the parent educator, an unsettling amount of time blaming M.C.'s sibling for the status of her life.[89]

This Court joins in the Agency's and the guardian *ad litem*'s position that the most appropriate placement for M.C. is the loving and stable foster home in which she has lived since she was less than two years old, based on Appellant's lack of progress toward the most critical goals the Agency set for her and discussed with her repeatedly. This Court determined after consideration of all the evidence that reunification would mean placing the child in nearly the same position she was in at the start of Agency involvement. Most notably, Appellant is still testing positive for methamphetamines and still void of personal responsibility for how her conduct and care affect M.C. Appellant instead continues to deny drug use, refuses mental health services, and evidently views Agency involvement as the direct result of M.C.'s sibling's conduct. Reunification is not feasible nor in the best interests of the child and would instead be detrimental to remove her from what has been, for all intents and purposes, her family for over a third of her life.

## CONCLUSION

This Court finds the issues raised by Appellant on appeal without merit. For the reasons articulated in the above Opinion, this Court respectfully requests the Superior Court of Pennsylvania to affirm this Court's order granting the Agency's Petition for

---

[86] N.T. II at 37-40.
[87] N.T. I at 21-23.
[88] Id. at 22.
[89] N.T. II at 16-17.

17

Termination of Parental Rights of Appellant, E.C., and the child's permanency goal change to adoption.

BY THE COURT,

_Christylee L. Peck_

Christylee L. Peck,      J.

R.H. Hawn, Jr., Esq.
The Law Offices of R.H. Hawn, Jr., LLC
39 Old Coach Lane
Carlisle, PA 17013
Attorney for Appellant/Mother

Lucy Johnston-Walsh, Esq.
Children's Advocacy Clinic
45 N. Pitt Street
Carlisle, PA 17013
Guardian *ad litem*

Lindsay D. Baird, Esq.
Cumberland County Children & Youth Services
16 West High Street
Suite 200
Carlisle, PA 17013
Solicitor for CCC&YS

IN THE INTEREST OF M.H.,   : IN THE COURT OF COMMON PLEAS OF
    a Minor               : CUMBERLAND COUNTY, PENNSYLVANIA
                                     :
                                     :

Appeal of E.C., Mother      : 141-DP-2017

## OPINION PURSUANT TO PA.R.A.P. 1925

Peck, J., February _8_, 2019 –

On September 27, 2017, M.H. was placed in emergency protective custody of Cumberland County Children and Youth Services (CCCYS, or the Agency).[1] The following day, on September 28, 2017, the child was placed in shelter care[2] and ordered dependent.[3] On September 4, 2018, the Agency, by and through its solicitor, Lindsay D. Baird, Esquire, filed a Petition for Goal Change Permanency Hearing to change the goal to adoption permanency,[4] and a Petition for Involuntary Termination of Parental Rights of E.C. on November 15, 2018.[5]

This Court held a hearing on the Agency's goal change and termination petitions over the course of two days on November 28, 2018 and December 3, 2018, and ordered the goal change from reunification to adoption on November 28, 2018.[6] At the close of the December 3, 2018 hearing and on consideration of the evidence, this Court terminated Appellant's parental rights by Final Decree as to both of her children.[7] Appellant filed a Notice of Appeal and Statement of Matters Complained of on Appeal

---

[1] CCCYS Exhibit No. 2, Order for Emergency Protective Custody, September 27, 2017 (Guido, P.J.); Transcript of Proceedings, In Re: Termination of Parental Rights/Goal Change/Permanency Review, November 28, 2018, at 34 (Peck, J.) (hereinafter "N.T. I at ___.").

[2] Recommendation for Shelter Care, September 28, 2017 (adopted by court order dated October 10, 2017).

[3] CCCYS Exhibit No. 2, Recommendation for Adjudication and Disposition – Child Dependent, September 28, 2017 (adopted by court order dated October 10, 2017); N.T. I at 34.

[4] Petition for Goal Change Permanency Hearing, September 4, 2018.

[5] Petition for Involuntary Termination of Parental Rights of E.C. Under Section 2512 of the Adoption Act, November 15, 2018.

[6] Permanency Review Order, November 28, 2018 (Peck, J.).

[7] Re: Petition for Involuntary Termination of Parental Rights of E.C. Under Section 2512 of the Adoption Act, In Re: Adoption of M.H., Final Decree, December 3, 2018 (Peck, J.); Re: Petition for Involuntary Termination of Parental Rights of E.C. Under Section 2512 of the Adoption Act, In Re: Adoption of M.C., Final Decree, December 3, 2018 (Peck, J.).

on December 28, 2018, complaining that this Court erred in terminating Appellant's parental rights, as well as in ordering a goal change to adoption.[8] Appellant complains as follows:

> The trial court abused its discretion and committed an error of law when it found, despite a lack of clear and convincing evidence, that sufficient grounds existed for a termination of appellant's parental rights in her child, and when it failed to primarily consider the child's developmental, physical and emotional needs and welfare, thus contravening sections 2511(a) and 2511(b) of the Adoption Act, 23 Pa.C.S.A. §§ 2511(a) and 2511(b).[9]

> The trial court abused its discretion and committed an error of law when it found, despite a lack of clear and convincing evidence, that the child's permanent placement goal of reunification was neither appropriate, nor feasible and ordered a goal change to adoption, thus contravening section 6351(f) of the Juvenile Act, 42 Pa.C.S.A. § 6351(f).[10]

Pursuant to Pa. R.A.P. 1925(a), this Opinion is written in support of this Court's judgment.

## STATEMENT OF FACTS

### a. Background

Appellant is the biological mother of M.H., born in 2007. Agency involvement began in September of 2017 when the Agency received a referral based on Appellant's delay in response to the child's mental health needs, concerns with the condition of the home, Appellant's drug use, and domestic violence and inappropriate discipline in the home.[11] On September 21, 2017, staff at M.H.'s school became concerned with M.H.'s mental

---

[8] Concise Statement of Matters Complained of on Appeal, December 28, 2018 (Orphan's Court docket); Concise Statement of Matters Complained of on Appeal, December 28, 2018 (dependency docket).
[9] Concise Statement of Matters Complained of on Appeal, December 28, 2018 (Orphan's Court docket).
[10] Concise Statement of Matters Complained of on Appeal, December 28, 2018 (dependency docket).
[11] CCCYS Exhibit No. 2, Recommendation for Adjudication and Disposition – Child Dependent, September 28, 2017 (adopted by court order dated October 10, 2017); N.T. I at 35.

2

health when she self-harmed by inflicting superficial injuries to herself.[12] The school could not reach Appellant by phone, and ultimately the police went to Appellant's home to inform Appellant of the incident and request that she come to the school.[13] Appellant waited until the following day to take M.H. to crisis care, where it was recommended that Appellant place the child in outpatient mental health treatment.[14] Appellant did not do so, nor did she take any action to obtain mental health help for the child.[15]

An Agency caseworker interviewed M.H. at her school on September 26, 2017, where the child reported domestic violence in the home between Appellant and Appellant's paramour, as well as a lack of food in the home.[16] The child also reported concerns that Appellant and Appellant's paramour used drugs in the home, and Appellant reported to the caseworker at that time that a drug test may be positive because of accidental meth ingestion.[17] At this time, the caseworker confirmed that M.H. was not up to date on immunizations, and the school sent notice that M.H. would not be permitted to attend school without updated immunizations.[18] The child was placed in shelter care and ordered dependent.[19]

---

[12] Recommendation for Shelter Care, September 28, 2017 (adopted by court order dated October 10, 2017); CCCYS Exhibit No. 2, Recommendation for Adjudication and Disposition – Child Dependent, September 28, 2017 (adopted by court order dated October 10, 2017); N.T. I at 35.

[13] CCCYS Exhibit No. 2, Recommendation for Adjudication and Disposition – Child Dependent, September 28, 2017 (adopted by court order dated October 10, 2017); Transcript of Proceedings, In Re: Continued Termination of Parental Rights/Goal Change/Permanency Review, December 3, 2018, at 29 (Peck, J.) (hereinafter "N.T. II at ___.").

[14] CCCYS Exhibit No. 2, Recommendation for Adjudication and Disposition – Child Dependent, September 28, 2017 (adopted by court order dated October 10, 2017); N.T. II at 34.

[15] CCCYS Exhibit No. 2, Recommendation for Adjudication and Disposition – Child Dependent, September 28, 2017 (adopted by court order dated October 10, 2017); N.T. II at 32-36.

[16] CCCYS Exhibit No. 2, Recommendation for Adjudication and Disposition – Child Dependent, September 28, 2017 (adopted by court order dated October 10, 2017); N.T. I at 35.

[17] CCCYS Exhibit No. 2, Recommendation for Adjudication and Disposition – Child Dependent, September 28, 2017 (adopted by court order dated October 10, 2017); N.T. I at 35.

[18] CCCYS Exhibit No. 2, Recommendation for Adjudication and Disposition – Child Dependent, September 28, 2017 (adopted by court order dated October 10, 2017).

[19] Recommendation for Shelter Care, September 28, 2017 (adopted by court order dated October 10, 2017); CCCYS Exhibit No. 2, Recommendation for Adjudication and Disposition – Child Dependent, September 28, 2017 (adopted by court order dated October 10, 2017).

Throughout Agency involvement, the permanency plans in place each had the primary goal of reunification.[20] The Agency's Initial Family Service Plan for Appellant was developed on October 27, 2017, with continued revisions through June 18, 2018.[21] At the time of the termination and goal change hearing, as testified to by CCCYS caseworker Debra Zervanos, Appellant's Family Service Plan recommended that Appellant obtain and maintain adequate and safe housing, work toward improving the parent-child relationship, eliminate domestic violence and inappropriate discipline in the home, achieve drug and alcohol sobriety, achieve mental health stability, and cooperate with the Agency and the criminal justice system.[22] Appellant took some measures to meet her goals, but Appellant failed in the follow-through of the Agency's and this Court's most critical concerns, including continued drug use, lack of progress in her own mental health, lack of concern for M.H.'s mental health, lack of effort in improving her relationship with M.H., and misplaced blame on M.H. for Agency involvement.

This Court held a goal change and termination hearing over two days. On November 28, 2018, this Court ordered the goal change from reunification to adoption.[23] At the close of evidence on December 3, 2018, this Court terminated Appellant's parental rights.[24]

b. Appellant's Status at the Time of the Goal Change and Termination Hearing

Appellant was expected to maintain adequate and safe housing, work toward improving the parent-child relationship, eliminate domestic violence and inappropriate discipline in the home, achieve drug and alcohol sobriety, achieve mental health stability, and cooperate with the Agency and criminal justice system.[25]

---

[20] CCCYS Exhibit No. 6, Initial Child's Permanency Plan dated January 10, 2018, revised January 16, 2018, June 19, 2018, October 22, 2018.

[21] CCCYS Exhibit No. 7, Initial Family Service Plan dated October 27, 2017, revised January 16, 2018, June 18, 2018.

[22] CCCYS Exhibit No. 7, Family Service Plan dated June 18, 2018.

[23] Permanency Review Order, November 28, 2018 (Peck, J.).

[24] Re: Petition for Involuntary Termination of Parental Rights of E.C. Under Section 2512 of the Adoption Act, Final Decree, December 3, 2018 (Peck, J.).

[25] CCCYS Exhibit No. 7, Family Service Plan dated June 18, 2018.

4

Agency concerns with housing stemmed most critically from the unsanitary condition of the home, the amount of accessible weapons that Appellant and her paramour display in the home, as well as the lack of an appropriate bedroom for Appellant's children.[26] As to weaponry, Appellant and her paramour display knives on the wall of their bedroom, which posed a danger most particularly to M.H. in light of her suicidal ideations, and had a BB gun accessible to the children in the kitchen on top of the refrigerator.[27] Testimony at the termination and goal change hearing showed that at the time of initial Agency involvement, the bedroom door was left ajar to allow heat from the kerosene heater in the living room to heat all of the home, and the knives were therefore accessible to M.H.[28]

An unannounced Agency home-visit in September of 2017 showed debris, garbage, and old food lying about, and the bedroom for the children consisted of only a mattress on the floor.[29] By March of 2018, still posing concerns in the home were various car parts, including blow torches, and dog feces.[30] At the termination hearing, Appellant presented recent photographs she took of the inside of the home, showing progress she made about a year after initial Agency involvement, including a bedroom for the children.[31] Appellant testified that, contrary to the Agency's records and testimony, she kept the bedroom door locked since the lock was recommended to her when she took M.H. to crisis care.[32]

Appellant showed lack of progress and motivation to improve her relationship with M.H. or cooperate with the Agency. Appellant obtained a parenting assessment; the resulting recommendation was that she obtain a psychological evaluation, obtain a drug evaluation, and participate in the parenting education program.[33] Appellant's parent educator in the program, Erin Brown of Alternative Behavior Consultants ("ABC"),

---

[26] N.T. I at 38, 49-50.

[27] Id. at 50, 70.

[28] Id.

[29] N.T. II at 92-93.

[30] Id. at 11.

[31] See, e.g., id. at 20-21. The ABC supervisor noted that the recent photos depicted the home "look[ing] remarkably different now in these photographs." Id. at 21.

[32] Id. at 28.

[33] N.T. I at 31; N.T. II at 6.

testified that it took her two weeks to get return contact from Appellant to begin the program.[34] Subsequently, Appellant was a no-show for the first and third sessions.[35] Appellant did ultimately complete the parenting program, but Ms. Brown testified that Appellant showed lack of accountability or focus on the children during those sessions. Ms. Brown reported that "a lot of the sessions circled around her relationship with [her paramour]," and that "[t]here were times where . . . she would place all the blame on one of the children instead of taking any responsibility for things."[36] Ms. Brown explained that the blame on the children centered mostly on M.H., and that Appellant "made no mention of [']I did this so ABC occurred.['].[37] Instead, "[i]t was more so [M.H.] has a history of not telling the truth. And [M.H.] has done this and [M.H.] has done that. So it was all focused around what [M.H.] has done to lead us to that point."[38] M.H.'s testimony in chambers supported this perception of Appellant's blame of M.H. for Agency involvement. M.H. testified that at a visit with Appellant, Appellant stated to M.H., "[Y]ou could be home with me. You should have never told the school what happened or you would have never been here."[39]

Appellant additionally attended only four of the eleven visits with M.H. that the Agency offered through ABC.[40] Notably, Appellant missed a visit on M.H.'s birthday.[41] The caseworker testified that M.H. "was so very excited to see her mom on her birthday at ABC, and then her mom didn't show up."[42] M.H. left in tears.[43]

As to mental health, Appellant's parenting assessment resulted in a recommendation to obtain a psychological evaluation, and the Family Service Plan additionally listed a goal for Appellant to obtain a mental health assessment and follow all resulting

---

[34] N.T. II at 7.
[35] Id.
[36] Id. at 8.
[37] Id. at 9.
[38] Id.
[39] Id. at 86.
[40] N.T. I at 25-26.
[41] Id. at 43.
[42] Id.
[43] Id.

recommendations.[44] In March of 2018, Appellant sent the Agency caseworker an evaluation that did not include any input from the Agency or show any indication of psychological testing.[45] Appellant testified that she was aware the document was unacceptable to the Agency as an evaluation, but did not obtain any further evaluations because she disagreed that the evaluation lacked Agency input.[46]

Appellant is routinely testing positive for methamphetamines. Appellant was participating in drug screens from March 2018 through the time of the termination hearing in November 2018.[47] Appellant's first screening was on March 13, 2018 when she tested positive for methamphetamines and subsequently failed to appear for screenings for three months.[48] Thereafter, Appellant again tested positive for methamphetamines on June 27, July 12, September 14, September 18, September 26, October 4, October 15, October 24, and November 8 of 2018.[49] In the midst of the screens, in August of 2018, the caseworker sent Appellant notice that she would be removed from the program for failing to appear at appointments.[50] The Restorative Sanctions Coordinator who supervised the drug screens testified that she told Appellant multiple times that she could get Appellant help, given her repeated positive screens, but Appellant denied using meth other than stating she once accidentally used meth when she used a friend's vape.[51]

Appellant completed three drug and alcohol evaluations but failed to follow through with the recommendations. The evaluations from May 5, 2018 and August 2, 2018 recommended outpatient groups for Appellant, but Appellant did not comply and was therefore discharged against advice.[52] Appellant's August 31, 2018 evaluation

---

[44] Id. at 31, 38. The Agency included the mental health goal in the Family Service Plan because M.H. reported that Appellant had threatened to harm herself and because of the parenting assessment recommendation. Id. at 41.
[45] Id. at 40-41.
[46] N.T. II at 40-41.
[47] N.T. I at 10.
[48] Id.
[49] Id.
[50] Id. at 40.
[51] Id. at 16, 82.
[52] Id. at 39.

7

recommended inpatient treatment, but Appellant again failed to comply.[53] Appellant testified that she "never received paperwork in the mail" from the first evaluation, that she did not comply with a recommendation for group in the second evaluation because the meeting time interfered with visits with her children and with her work schedule, and that the third evaluation was "coerced" by the Agency.[54] Appellant stated that she ultimately obtained a fourth assessment because she disagreed with the third assessment's recommendation to participate in inpatient treatment.[55] At the time of the termination hearing, Appellant stated she was planning to go to group meetings.[56]

As to domestic violence, the Agency's concerns stemmed from M.H.'s statements to the initial caseworker that Appellant would threaten suicide when Appellant and her paramour argued, which they frequently did, and that M.H. witnessed Appellant's paramour pull Appellant by the hair on at least one occasion.[57] M.H. also stated that Appellant's paramour turned off the electricity during an argument with Appellant, which resulted in M.H.'s younger sibling tripping over a cinder block and injuring herself inside the home.[58] At the termination hearing, M.H. testified in chambers that Appellant's paramour hit M.H. with a wooden post, and that Appellant has hit her with a metal hanger across her back and thrown objects at her when she cried too much.[59] M.H. also stated that she once watched Appellant's paramour's sister "beat up" Appellant in the home.[60] The initial caseworker testified that M.H. was required to carry cinder blocks, lie on the ground and hold up cinder blocks for periods of time, and engage in other physical training for discipline, and that Appellant denied such activities and ultimately blamed M.H. for M.H.'s removal from the home.[61] The extent of Appellant's progress consists of Appellant giving the caseworker a certificate several years old showing she completed a

[53] Id. at 39-40.
[54] N.T. II at 37-48.
[55] Id. at 38-39.
[56] Id. at 39-40.
[57] Id. at 91.
[58] Id. at 92.
[59] Id. at 80-81.
[60] Id. at 86.
[61] Id. at 48, 93.

8

domestic violence session, as Appellant felt she needed no more counseling in that area.[62] Appellant denies any domestic violence persists in the household.[63]

Appellant ultimately failed to alleviate concerns that led to Agency involvement or make significant progress on her goals.

c. M.H.'s Status at the Time of the Hearing

M.H. is eleven years old. She lives with a foster family but is transitioning into a new placement with a new foster family, where M.H. stated she is happy to go so that she can have more children to be around and "finally have brothers."[64] The child will not have to change schools after her transition and the services she receives at school will not be interrupted.[65] The child is in an emotional therapeutic support classroom, which conducts group and individual therapy in the classroom.[66] She also attends a trauma-based team meeting every other week.[67] M.H. visits with her maternal and paternal grandparents every few months at the Agency.[68] M.H. has been in contact with her biological father a few times via phone since she came into Agency care, but he is not a resource for her.[69] The Agency was unable to place M.H. and her sibling together, but the children see each other on a regular basis and their respective foster families are in ongoing contact.[70]

M.H. had been out of Appellant's care for over a year at the time of the termination hearing.[71] M.H. has voiced her hope to see Appellant less and see her "adopted mom"

---

[62] N.T. I at 39.

[63] Id.

[64] Id. at 76; N.T. II at 80.

[65] N.T. I at 76-77.

[66] Id. at 47. M.H. takes medication for depression and PTSD diagnoses. Id.

[67] Id.

[68] Id. at 48.

[69] Id. at 53. The Agency asked M.H.'s biological father to cooperate with all probation and parole requirements when he was released from incarceration, but has not heard from him since his release and is not aware of his location. Id.

[70] Id. at 46.

[71] M.H. was placed in emergency protective custody of the Agency on September 27, 2017. CCCYS Exhibit No. 2, Order for Emergency Protective Custody, September 27, 2017 (Guido, P.J.); N.T. I at 34.

9

more.[72] She expressed continuing concern with violence in Appellant's home and Appellant's drug use, and hopes to move forward with her foster family.[73]

## DISCUSSION

This Court begins by addressing the standard of review applicable to Appellant's claims. Pennsylvania appellate courts "adhere[] to the view that the trial court is in the best position to determine credibility, evaluate the evidence, and make a proper ruling." In re R.I.S., 36 A.3d 567, 572 (Pa. 2011) (internal citations omitted). Absent an abuse of discretion or error of law, where the trial court's findings are supported by competent evidence, an appellate court must affirm the trial court even though the record could support the opposite result. In the Interest of R.J.T., 9 A.3d 1179, 1190 (Pa. 2010). Pennsylvania courts have held that "an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." In re Adoption of S.P., 47 A.3d 817, 826 (Pa. 2012) (internal citations omitted).

Appellant argues that this Court erred in terminating her parental rights under 23 Pa.C.S. § 2511(a) and (b), and that this Court erred in ordering the goal change to adoption.[74] We begin by addressing the termination of parental rights. When evaluating a petition for termination of parental rights, a court must conduct a two-part analysis. First, a court must determine if the Agency has proven that at least one of the statutory grounds of termination set out in 23 Pa.C.S. § 2511(a) has been met. See In re B.L.W., 843 A.3d 380, 384 (Pa. Super. 2004) (*en banc*). Second, the court must evaluate whether the termination is in the best interest of the child, as required by 23 Pa.C.S. § 2511(b). Id. The burden is on the Petitioner to prove by clear and convincing evidence[75] that the

---

[72] N.T. II at 85.

[73] Id. at 85-87, 100.

[74] Concise Statement of Matters Complained of on Appeal, December 28, 2018 (Orphan's Court docket); Concise Statement of Matters Complained of on Appeal, December 28, 2018 (dependency docket).

[75] "Before terminating a parent's rights, the trial court must receive testimony 'that is so clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of

10

asserted grounds for seeking the termination of parental rights are valid. In re R.N.J., 985 A.2d 273, 276 (Pa. Super. 2009). Appellant argues that the Agency failed to meet the statutory grounds for termination of parental rights under 23 Pa.C.S. § 2511(a) and (b).

a. Sufficiency of Evidence of Statutory Ground Under 23 Pa.C.S. § 2511(a)

The fulfillment of any one subsection of Section 2511(a) satisfies a threshold sufficient for a court to proceed to evaluate the best interests of the child under Section 2511(b). In re B.L.W., 843 A.3d 380, 384 (Pa. Super. 2004) *(en banc)*. The Agency alleged in its Petition the following grounds under Section 2511(a) to terminate Appellant's parental rights:

I. 23 Pa.C.S.A 2511 a (2): The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for the child's physical or mental well-being and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

II. 23 Pa.C.S.A 2511 a (5): The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time, and termination of the parental rights would best serve the needs and welfare of the child.

III. 23 Pa. C.S.A 2511 a (8): The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, twelve months or more have lapsed from the date of the removal or placement, the conditions which led to the removal or placement of the child continue to exist, and termination

the truth of the precise facts in issue.'" In re Adoption of A.C., 162 A.3d 1123, 1133 (Pa. Super. 2017) (quoting *In re Adoption of Atencio*, 650 A.2d 1064, 1066 (Pa. 1994)).

of parental rights would best serve the needs and welfare of the child.[76]

In this case, M.H. was placed in emergency protective custody of the Agency on September 27, 2017[77] and ordered dependent and placed in shelter care on September 28, 2017,[78] over a year prior to termination of Appellant's parental rights on December 3, 2018.[79] M.H. was removed from Appellant's care based on M.H.'s mental health crisis at school and Appellant's delay in response thereto, as well as reports of domestic violence and inappropriate punishment for M.H. in the home.[80] Shortly after the Agency received the referral for M.H., the caseworker learned from Appellant that she "had accidentally taken [m]ethamphetamines by vaporization provided by a friend," and learned of M.H.'s concerns for Appellant and her paramour's drug use in the home.[81]

Over the course of the 14 months since M.H.'s removal from Appellant's care, the Agency revised the Family Service Plan twice to help Appellant make the changes necessary to appropriately care for the child.[82] Appellant's overall progress with her goals can be summarized by a statement the caseworker made at the termination hearing:

> I think she tries. I think [Appellant] starts. It's the follow-through, the completion. . . . And in fact, very recently I even sent her a letter and tried to step by step [tell Appellant] what needed to be done, all the objectives that she needed to still do to complete. When we were out at her home, we did that. We had a team meeting following the last hearing, so there were opportunities. . . . I think [Appellant] will schedule a drug and alcohol evaluation [for example], and then maybe she'll be late to

---

[76] Petition for Involuntary Termination of Parental Rights of E.C. Under Section 2512 of the Adoption Act, November 15, 2018.

[77] CCCYS Exhibit No. 2, Order for Emergency Protective Custody, September 27, 2017 (Guido, P.J.); N.T. I at 34.

[78] Recommendation for Shelter Care, September 28, 2017 (adopted by court order dated October 10, 2017); CCCYS Exhibit No. 2, Recommendation for Adjudication and Disposition – Child Dependent, September 28, 2017 (adopted by court order dated October 10, 2017).

[79] Re: Petition for Involuntary Termination of Parental Rights of E.C. Under Section 2512 of the Adoption Act, Final Decree, December 3, 2018 (Peck, J.).

[80] CCCYS Exhibit No. 2, Order for Emergency Protective Custody, September 27, 2017 (Guido, P.J.);

[81] Recommendation for Shelter Care, September 28, 2017 (adopted by court order dated October 10, 2017); N.T. I at 35.

[82] CCCYS Exhibit No. 7, Initial Family Service Plan dated October 27, 2017, revised January 16, 2018, June 18, 2018.

12

it; and it will need to be rescheduled or maybe she'll forget or maybe she'll go and do that part, but then not do the recommendations. So we often just start. It just doesn't follow through.[83]

Appellant's progress has been minimal. Appellant refuses to follow recommendations based on her disagreement with the same. Appellant was expected to work on her relationship with M.H., but missed so many scheduled visits, including M.H.'s birthday visit, that the visitation supervisor and caseworker both testified that it was difficult to report on the quality of the visits because of their infrequency.[84]

Appellant's parenting skills assessment resulted in a recommendation to attend a parenting skills course, for which Appellant missed two of the first three appointments.[85] When Appellant did appear and complete the program, she placed blame on M.H. for Agency involvement,[86] leading the parent educator to have concerns with Appellant's ability to make strides without "some sort of understanding of what [her] part or role is in a situation."[87]

Appellant's denial of responsibility for the conditions leading to M.H.'s removal reverberated throughout Agency involvement, preventing Appellant from meeting her Family Service Plan goals. Appellant tested positive for methamphetamines in March of 2018, missed three months of testing, and then again tested positive in June, July, September, October, and November of 2018 just prior to the termination hearing.[88] Appellant, however, refused help and denied using meth other than an "accidental ingestion" around the time of the Agency referral in September of 2017.[89] Appellant additionally failed to meet her mental health goal for failure to allow the Agency adequate input into her mental health evaluation.[90]

---

[83] N.T. I at 71-72.
[84] Id. at 21, 43.
[85] N.T. II at 10.
[86] Id. at 8-9.
[87] Id. at 16.
[88] N.T. I at 8-10.
[89] Id. at 16, 82.
[90] N.T. II at 40-41.

Since M.H. was removed from Appellant's care, Appellant has made only minimal strides in achieving her goals and failed in the follow-through in every arena to the extent that the circumstances prompting Agency involvement from the start continue to exist, over a year after Agency intervention. Accordingly, Section 2511(a)(8) is satisfied. The Agency has also proven by clear and convincing evidence that Appellant will not remedy these conditions within a reasonable period of time, given Appellant's lack of willingness to accept her role in Agency involvement and failure to make any significant progress to remedy the circumstances leading thereto in the 14 months Appellant had to make those changes. Section 2511(a)(5) is therefore satisfied. Finally, the Agency satisfied Section 2511(a)(2) by clear and convincing evidence given Appellant's repeated neglect of M.H.'s mental health needs, causing her to be without essential parental care. Given Appellant's denial of responsibility for her role in the circumstances, it appears such neglect of M.H. will not be remedied in the future.

With at least one of the statutory grounds met pursuant to 23 Pa.C.S. § 2511(a), this Court turned to Section 2511(b)—whether termination serves the best interests of the child, as discussed *infra*.

b. Sufficiency of Evidence that Termination of Parental Rights was in the Child's Best Interest

Section 2511(b) requires that this Court determine whether termination is in the best interests of the child. A trial court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). See also In re B.L.W., 843 A.3d 380, 384 (Pa. Super. 2004) (*en banc*) (outlining the two-step analysis). Furthermore, "the rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent." 23 Pa.C.S. § 2511(b). Pennsylvania appellate courts have stated that the emotional needs and welfare of the child have properly been interpreted to include "intangibles such as love, comfort, security, and stability." In re K.M., 53 A.3d 781, 791 (Pa. Super. 2012). When making a

14

Section 2511(b) determination, the courts are to focus on the child, not the parent. In Re Adoption of C.L.G., 956 A.2d 999, 1008 (Pa. Super 2008) (*en banc*).

This Court finds competent evidence in the record that it is in M.H.'s best interests to terminate Appellant's parental rights and allow M.H. to transition into the care of her new foster family. Testimony from the current caseworker, the initial caseworker, the guardian *ad litem*, the attorney for the child, the ABC visitation supervisor, the parent educator, and M.H. herself evidenced that M.H.'s best interests cannot be vindicated in Appellant's care and are instead with a family that can care for M.H. and provide for her the stable, permanent, and safe home that an 11-year-old child requires.

M.H. will be transitioning into a new foster home where she is happy to go and spend the most time she can with her new foster mother, with whom she feels comfortable.[91] She is also happy to "finally have brothers."[92] M.H. stated frankly, "[s]ometimes I just sit in my room on Mondays and be like is it Friday yet because I just want to go with like my adoptive mom."[93] She is receiving the mental health services she needs both inside and outside of school and is doing well in those services.[94] She is also visiting with her grandparents and with her sister.[95] At the time of the termination hearing, 14 months had passed since M.H. was removed from Appellant's care, and M.H. has since adjusted well. In that time, Appellant failed to follow through with any services to remedy the Agency's and this Court's concerns about M.H.'s well-being in her care. The Agency has proven, by clear and convincing evidence, that it is in the best interests of the child to terminate Appellant's parental rights pursuant to 23 Pa.C.S. § 2511(b).

c. Goal Change to Adoption and Appellant's Progress

Finally, Appellant complains on appeal,

> The trial court abused its discretion and committed an error of law when it found, despite a lack of clear and convincing evidence, that the child's permanent placement goal of

---

[91] Id. at 80.
[92] Id.
[93] Id. at 85.
[94] N.T. I at 47.
[95] Id. at 46–48.

15

reunification was neither appropriate, nor feasible and ordered a goal change to adoption, thus contravening section 6351(f) of the Juvenile Act, 42 Pa.C.S.A. § 6351(f).[96]

When considering a petition for a goal change to adoption of a dependent child, the trial court will evaluate:

> the continuing necessity for and appropriateness of the placement; the extent of compliance with the service plan developed for the child; the extent of progress made towards alleviating the circumstances that necessitated the original placement; the appropriateness and feasibility of the current placement goal for the child; and a likely date by which the goal for the child might be achieved.

In Interest of A.N.P., 155 A.3d 55, 66 (Pa. Super 2017) (internal citations omitted).

Although reunification of the family is the primary permanency goal, the Juvenile Act mandates the arrangement of "another alternative permanent family when the unity of the family cannot be maintained." 42 Pa.C.S. § 6301(b). Accordingly, reuniting a child with his or her biological parent(s) rather than changing the goal to adoption should not become "rigid adherence to the principle regardless of the circumstances." In re J.S.W., 651 A.2d 167, 170 (Pa. Super 1994). Changing a child's goal to adoption is based on the policy that "[a] child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting." In re Adoption of M.E.P., 825 A.2d 1266, 1276 (Pa. Super. 2003). If a child welfare Agency has made reasonable efforts at reunification that have failed, then within 18 months, the Agency must redirect its efforts toward *finalizing* permanency for the child in an adoptive home. In re G.P.-R., 851 A.2d 967 (Pa. Super. 2004) (emphasis added). The trial court looks to subsections 6351(e), (f), (f.1), and (g) of the Juvenile Act[97] to determine the permanency goal that is "best suited to the safety, protection, and physical, mental, and moral welfare of the Child." In Interest of A.N.P., 155 A.3d at 67. The best interests of the child must direct the Court's reasoning, and the "[s]afety, permanency, and well-being of the child must

---

[96] Concise Statement of Matters Complained of on Appeal, December 28, 2018 (dependency docket).
[97] See 42 Pa.C.S. § 6351.

16

take precedence over *all* other considerations, including the rights of the parents." In re A.K., 906 A.2d 596 (Pa. Super. 2006); In re N.C., 909 A.2d 818, 823 (Pa. Super 2006) (emphasis in original).

This Court's decision to order the goal change to adoption was not one of determining that the child has waited long enough for permanency, though M.H. has, or that the time when Appellant will be able to appropriately care for and ensure the safety and mental well-being of the child is at some time too far into the future. This Court ordered the goal change because of sufficient evidence that such a time will not come. Appellant has demonstrated an unwillingness to change the circumstances that led to Agency involvement because of, evidently, her belief that she is not in need of Agency services and that the Agency's concerns have somehow been contrived from the start or the result of fabrications on the part of M.H. Fourteen months passed between M.H.'s removal from Appellant's care and the goal change to adoption permanency. As discussed in the above sections of this Opinion, Appellant is unwilling to accept her role in Agency involvement and has refused to accept or act on recommendations made to her in the 14-month effort to reunify Appellant with the child.

In March of 2018, Agency visits to the house still showed dog feces in the home, blow torches and car parts lying about, the plethora of decorative knives still present and accessible to a child showing suicidal ideations, and no appropriate bedroom for Appellant's children.[98] Appellant tested positive for methamphetamines from March of 2018 through November of 2018, and continues to deny any drug use at all outside of "accidentally ingesting meth" once prior to Agency involvement.[99] Appellant refused to obtain a drug and alcohol assessment and follow up on recommendations based on her disagreement with the same and insistence she does not need help.[100] Appellant attended only four of eleven visits with M.H. offered by the Agency.[101] Appellant was asked to attend parenting education services, but spent, according to the parent educator, an

---

[98] N.T. II at 11.
[99] N.T. I at 10, 16, 82; N.T. II at 39.
[100] N.T. II at 37-40.
[101] N.T. I at 25-26.

17

unsettling amount of time blaming M.H. for the status of her life and discrediting M.H.'s mental health needs.[102]

It is the best interests of the child that must drive this Court's reasoning and take precedence over Appellant's insistence that she is not in need of services or Agency involvement to parent the child. M.H. is eleven years old. She is aware of why the Agency got involved, why the Agency removed her from Appellant's home, and the consequences of the Agency's petitions for a goal change and for termination of Appellant's rights.[103] M.H. voiced concerns at the hearing that she voiced from the start about Appellant's drug use and inappropriate punishment and domestic violence in the home.[104] Those circumstances remained unchanged since September of 2017.

This Court joins in the Agency's and the guardian *ad litem*'s position that the most appropriate permanent placement for M.H. is the foster home to which she is now transitioning, based on Appellant's lack of progress toward the most critical goals the Agency set for her and discussed with her repeatedly. This Court determined after consideration of all the evidence that reunification would mean placing the child in nearly the same position she was in at the start Agency involvement. Most notably, Appellant is still testing positive for methamphetamines and still void of personal responsibility for how her conduct and care affect M.H., a child in need of mental health services. Appellant instead denies drug use, refuses mental health services for herself, and evidently views Agency involvement as the direct result of *the child's conduct*. Reunification is not feasible nor in the best interests of the child.

## CONCLUSION

This Court finds the issues raised by Appellant on appeal without merit. For the reasons articulated in the above Opinion, this Court respectfully requests the Superior Court of Pennsylvania to affirm this Court's order granting the Agency's Petition for

---

[102] N.T. II at 16-17.
[103] Id. at 78.
[104] Id. at 80-87.

Termination of Parental Rights of Appellant, E.C., and the child's permanency goal change to adoption.

BY THE COURT,

_Christylee L. Peck,_      J.

R.H. Hawn, Jr., Esq.
The Law Offices of R.H. Hawn, Jr., LLC
39 Old Coach Lane
Carlisle, PA 17013
Attorney for Appellant/Mother

Lucy Johnston-Walsh, Esq.
Children's Advocacy Clinic
45 N. Pitt Street
Carlisle, PA 17013
Guardian *ad litem*

Lindsay D. Baird, Esq.
Cumberland County Children & Youth Services
16 West High Street
Suite 200
Carlisle, PA 17013
Solicitor for CCC&YS

19